UNITED STATES of America

v.

Seymour POLLACK, Appellant.

UNITED STATES of America

v.

Paul M. SACHS, Appellant.

UNITED STATES of America

v.

William CUDD, Appellant.

Nos. 74–1455, 75–1451, 74–1460, 75–1157, 75–1454 and 74–1640.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 5, 1975.

Decided March 31, 1976.

Warren E. Magee, Washington, D. C. (appointed by this court in No. 75–1451), for appellant in Nos. 74–1455 and 75–1451.

Karl G. Feissner, Hyattsville, Md., with whom Stephen A. Friedman, Hyattsville, Md., was on the brief, for appellant in No. 74–1460; also argued for appellants in Nos. 74–1640 and 75–1454.

Thomas P. Smith, Hyattsville, Md., for appellant in No. 75–1157; also entered an appearance for appellant in No. 74–1460.

Thomas R. Dyson, Jr., Alexandria, Va., entered an appearance for appellant in No. 74–1640.

Justin D. Simon, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry and Robert W. Ogren, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before LUMBARD,[*] Senior Circuit Judge, and WRIGHT and WILKEY, Circuit Judges.

Opinion for the court filed by Senior Circuit Judge LUMBARD.

LUMBARD, Senior Circuit Judge:

Paul Sachs, Seymour Pollack and William Cudd were convicted on December 17, 1973 after a four-week trial before Judge Oliver Gasch in the District of Columbia for mail fraud, wire fraud, sale of unregistered securities, and aiding and abetting in violation of 15 U.S.C. §§ 77e, 77x and 18 U.S.C. §§ 2, 1341, 1343.[1] The indictment under which they were tried accused appellants of participation in an intricate scheme to obtain virtually worthless property, exchange it for stock of Control Metals Corporation on the basis of fraudulent reports and appraisals that the property contained highly valuable onyx deposits, and then sell the stock to the public before the issuing corporation could detect the fraud. Appellants now assign as error an ingenious variety of claims. Of those alleged errors that merit discussion, none is so compelling as to require reversal. We therefore affirm the convictions in all respects.

A summary of the government's evidence will suffice for purposes of our discussion. In March 1969, appellant Cudd purchased 640 acres of undeveloped prairie land, including four onyx placer claims, near Mayer, Arizona. Even as Cudd was negotiating his purchase of the property and agreeing to obtain the financing necessary to put the placer claims into production, Seymour Pollack was soliciting exchanges of the property for stock. In July 1969, Pollack approached George Hall and other directors of Control Metals Corporation, a publicly owned forger of metals, located in Arizona, and suggested a plan to ameliorate the corporation's precarious financial condition. The plan required Pollack to invest $300,000 in Control Metals and the latter to purchase a one-tenth undivided interest in the Cudd property which Pollack claimed had "an exceptionally large deposit of good grade onyx." Pollack asserted that the property was owned by Fountainhead International, Inc., a company incorporated in the District of Columbia with which he claimed to be "involved." Pollack produced a letter, an appraisal and a promise of further reports testifying to the value of the property. By August 4, 1967 it had been agreed that in return for the cash and the Cudd property, Control Metals was to transfer four million shares of its common stock to Fountainhead and 600,000 shares of restricted investment stock to International Marketing, Inc., another company controlled by Pollack. Aside from the economic incentives, Pollack offered to obtain the resignations of dissident directors of Control Metals who were not involved in the discussions involving the onyx property. Paul Sachs, an attorney practicing in the District of Columbia, who had been presented to Hall as Pollack's attorney, urged Control Metals to accept the offer to avoid financial collapse. Sachs asserted that he was a shareholder of Control Metals who wanted to protect his investment.

Agreements to effectuate the proposed transaction were drawn up in Washington by Sachs and Thayer Lindauer, the attorney for the directors, and executed there by two of Pollack's employees, Joseph Gold and Georgia Liakakis, who signed as officers of Fountainhead and International Marketing although they were not. The Board of Directors of Control Metals agreed to the

---

[*] Of the Second Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. Appellant Pollack was found guilty of five counts of mail fraud, three counts of wire fraud, and five counts of selling unregistered securities. Appellant Sachs was found guilty on all sixteen counts of the indictment. Appellant Cudd was found guilty on one count of mail fraud, two counts of wire fraud, and three counts of selling unregistered securities. Pollack and Sachs were sentenced to concurrent terms of imprisonment of five years on each count. Cudd was sentenced to concurrent terms of three years on each count.

Prior to trial defendants Stanley Kaiser and Harold Rothman entered pleas of guilty on superseding informations filed by the government.

arrangement after Pollack executed a personal three-year guarantee that the property would produce $100,000 gross earnings annually.

As the Control Metals board was deliberating whether to accept the proposal, Pollack and Sachs took steps to dissolve Fountainhead and generate a false list of shareholders of that corporation. When Sachs informed Lindauer that Fountainhead would be dissolved, he also noted that Pollack would procure proxies from Fountainhead's shareholders so the Control Metals stock, and the voting rights inherent therein, would not be dispersed. The clear implication of this statement was that the shares would not be resold to the general public.

In mid-August 1969, Sachs sent Lindauer an unsigned draft of an opinion letter concerning the registration requirements of the Securities Act of 1933 as they affected the Control Metals stock distribution to Fountainhead. After receiving additional documentation from Pollack, Lindauer issued an opinion letter indicating that the certificates to be presented to Pollack required no printed restrictions on salability and could be resold by Fountainhead shareholders as stock acquired in a liquidation under SEC Rule 133 which was then in effect. Three days later, at Lindauer's insistence, a second opinion letter was drafted certifying the legality of the dissolution of Fountainhead and explicating the salability of Control Metals stock when received by Fountainhead shareholders. Although Sachs played a major role in preparing the opinion letter, he informed Lindauer that he would prefer not to sign it because of previous difficulties with the SEC. Sachs recommended that the letter be signed by Stanley Kaiser, another Washington attorney "familiar" with the transaction, and Lindauer agreed to this arrangement.

Pollack received over 3 million shares of Control Metals stock in 682 separate certificates on August 12, 1969, the day after Lindauer had issued the initial opinion letter. At Pollack's request, large denomination certificates were broken down into smaller amounts by the Control Metals transfer agent, and were reissued in the names of various individuals and businesses.[2] In order to generate investor interest in Control Metals, Pollack and the directors of the corporation issued a press release asserting that the onyx property acquisition would bring guaranteed income of $100,000 per year. This information had been supplied to the issuing public relations firm by Pollack.[3]

Most of the 4 million shares of Control Metals stock ultimately given to Pollack were sold through straws, nominees and shell corporations named in accounts opened by the defendants with securities dealers throughout the country. Other shares were transferred directly to creditors in settlement of debts and these creditors resold the stock to the public. In addition to these methods of distribution, Pollack encouraged Michael Gardner, a securities dealer in New York and head of Gardner Securities, to enter into a partnership whereby Gardner's brokers would retail the stock directly to their investment clients and buy the stock for themselves. These measures avoided open market sales of large quantities of stock that might depress the per share price. There was also testimony that Sachs encouraged Gardner to manipulate the stock price by purchasing shares of Control Metals when the price started to decline. Sachs received proceeds of most of his sales only after they had been routed through an

---

**2.** Sachs expressed great interest in certain of these stocks to be issued in the name of P. J. Gruber and Company because, as he informed Gold, who transported the certificates, "they are mine."

**3.** In the meantime, Control Metals had discovered that the property previously represented as their valuable claim in fact adjoined their newly purchased property. Furthermore, several checks received from Pollack had been dishonored for insufficient funds and Pollack had made no payments on the $300,000 investment he was to make in Control Metals. With juvenile gullibility, the directors of Control Metals continued to accept the assurances of Pollack and Cudd that the promised property and cash would soon be in the corporate coffers.

account established by defendant Harold Rothman at the New Jersey firm of P. J. Gruber and Company in the name of a shell corporation and then transmitted by check to Sachs's girl friend, Jill Ciganek, who cashed them.

None of the appellants took the stand in his defense. They presented three witnesses who testified to the value of the Arizona onyx property and the validity of signatures on the appraisal of the property on which the Control Metals directors had relied.

### The Right to a Speedy Trial

Appellants' trial began on November 19, 1973, some six months after the return of the indictment and 4 years after the last acts charged by the government. Prior to the commencement of the trial, Pollack moved for dismissal of the indictment on the ground that the interim delay deprived him of his Sixth Amendment right to a speedy trial and Fifth Amendment right to due process and therefore the court should have dismissed the indictment pursuant to Fed.R.Crim.P. 48(b). We hold that Judge Gasch properly denied the motion.

■ The Sixth Amendment right to a speedy trial does not attach until the defendant becomes an "accused" either by means of indictment or information or arrest. *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468, 478–79 (1971). Our determination of whether that right was violated in this instance, therefore, is limited to the six-month interval between return of the indictment and commencement of the trial. See *United States v. Parish*, 152 U.S.App.D.C. 72, 77, 468 F.2d 1129, 1134 (1972), cert. denied 410 U.S. 957, 93 S.Ct. 1430, 35 L.Ed.2d 690 (1973). The record on appeal shows that pre-trial conferences and hearings and informal communications among the parties pervaded the entire period. We would ex-

pect no less in a multiparty securities fraud case where complex factual circumstances require pre-trial preparation of substantial scope and depth. Indeed, Pollack has also assigned as error the trial court's denial of his motion for a continuance to allow him additional time for discovery because he was held in New Jersey on an unrelated matter.[4] Given the posture of this case, the length of the delay, and the degree of prejudice to the defendant, see *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101, 116–17 (1972), we find no infringement of Pollack's speedy trial right.

■ There is similarly no evidence to support the claim that pre-indictment delay was caused by the prosecution's desire to "gain tactical advantage over the accused" or that it caused substantial prejudice to appellants' right to a fair trial in violation of the Fifth Amendment. 404 U.S. at 324, 92 S.Ct. at 465, 30 L.Ed.2d at 481. See *Nickens v. United States*, 116 U.S.App.D.C. 338, 342, 323 F.2d 808, 812 (1963), cert. denied 379 U.S. 905, 85 S.Ct. 198, 13 L.Ed.2d 178 (1964) (Wright, J., concurring) (pre-*Marion* case discussing deliberate delay in terms of Sixth Amendment).

■ We note that the statute of limitations serves as the primary safeguard against the bringing of stale criminal cases. See *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468, 480–81 (1971); *United States v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966). Since the period of delay in this case was little more than half the time permitted to the government for institution of criminal proceedings, 18 U.S.C. § 3282, appellants bear a substantial burden to demonstrate that they were prejudiced or that the government acted with impropriety. See *United States v. Capaldo*, 402 F.2d 821 (2d Cir. 1968), cert. denied 394 U.S. 989, 89 S.Ct. 1476, 22 L.Ed.2d 764 (1969).

---

4. Pollack had had five months to prepare for trial and was unable to provide objective evidence of an illness that purportedly required further delay. Given these facts, and the need to accommodate several defendants and wit-

nesses, we cannot say that the trial court abused its discretion by denying Pollack's motion. See *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849–50, 11 L.Ed.2d 921, 930–31 (1964).

No evidence satisfactory to meet this burden has been forthcoming. All indications suggest that once the matter was referred to the Department of Justice in the fall of 1971 for review as to possible criminal proceedings,[5] the investigation proceeded with all possible haste. Again, the complex nature of the case necessitated time-consuming investigation to determine whether an indictment should be sought, and, if so, the persons to be charged. Some degree of delay was occasioned by Sachs's persistent attempts to intervene in the grand jury deliberations and to receive repetitive briefings on the government's case against him. None of these administrative delays, however, indicates impropriety in the handling of the instant case.

Nor have appellants demonstrated that they suffered any appreciable prejudice during the period between completion of the scheme and return of the indictment. See *United States v. Cooper*, 164 U.S.App. D.C. 191, 504 F.2d 260 (1974). The death of an individual deemed by Pollack to be a key witness actually occurred during the course of the scheme charged in the indictment and thus his non-appearance cannot be attributed to pre-indictment delay. Nor can the disappearance of records in the interim be charged to the government where Pollack was on notice since 1969 that the transactions at issue were under investigation by the SEC, especially as Pollack has made no showing that he attempted to safeguard the records.

### The Need for a Bill of Particulars and the Sufficiency of the Indictment

While appellants contend that they were entitled to a bill of particulars, their failure to demonstrate surprise or prejudice by the lack of particularization belies the allegation that Judge Gasch abused his discretion in denying the motion. See *United States v. Salazar*, 485 F.2d 1972, 1277–78 (2d Cir. 1973), cert. denied 415 U.S.

985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). The allegations in the indictment outlined the scheme that was to be the subject of the prosecution and defined each defendant's role in that scheme in a manner sufficient to avoid surprise and permit defendants to prepare a defense. See *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir.), cert. denied 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). The indictment charged defendants with fraud in connection with obtaining stock of Control Metals Corporation in exchange for onyx properties and selling the stock through a network of accounts to conceal their interest in the proceeds. It listed various specific misrepresentations, promises, and concealments allegedly made by defendants as well as the dates and names of recipients of mail and wire use. Compare *United States v. Caine*, 270 F.Supp. 801 (S.D.N.Y.1967). Furthermore, even prior to the return of the indictment the Assistant United States Attorney in charge of the case met with counsel for Sachs and discussed the subject matter of the grand jury investigation. In these circumstances, appellants' demands for further particularization of overt acts, the circumstances surrounding the alleged acts, and attribution of the alleged misrepresentations may be construed as attempts to procure evidentiary material rejected within the discretion of the district judge. See *United States v. Mahany*, 305 F.Supp. 1205, 1209 (N.D.Ill.1969).

The indictment was sufficient and in accord with the requirements of Fed.R. Crim.P. 7(c). The ten-page indictment issued in this case not only tracked the language of statutes of which violations were charged, see *United States v. Trotta*, 525 F.2d 1096, 1099 (2d Cir. 1975), appeal docketed 44 U.S.L.W. 3439 (U.S. Feb. 3, 1976), but particularized in some detail the purpose and method of the fraudulent scheme.

Sachs's complaint that he was not identified as a principal, aider, or abet-

---

5. The original investigation of the Control Metals case was undertaken by the Securities and Exchange Commission in late summer of 1969. That investigation culminated in the filing of civil proceedings in the Southern District of New York in the fall of 1970. In the fall of 1971, the SEC decided to refer the matter to the Department of Justice for review as to possible criminal proceedings.

tor in the indictment is frivolous. The face of the indictment reveals that all defendants were in fact charged as principals and aiders or abettors. 18 U.S.C. § 2. Sachs's claim that the indictment fatally failed to specify his role in the scheme and merely included him within the nebulous phrase "defendants" is similarly devoid of merit. Sachs was in fact charged with specific acts necessary to carry out the scheme, e. g., controlling and operating accounts to distribute Control Metals stock to the investing public. Finally, once Sachs was implicated in the fraudulent scheme his participation in specific acts was irrelevant since the acts of other parties were attributable to him. See *United States v. Epstein*, 154 F.2d 806, 809 (2d Cir. 1945); *Blue v. United States*, 138 F.2d 351 (6th Cir. 1943).

■ Pollack's contention that the indictment was defective in that it failed to charge that anyone was defrauded or injured by appellant's machinations is without merit. The fraud statutes speak alternatively of devising or intending to devise a scheme to defraud and do not require that the deception bear fruit for the wrongdoer or cause injury to the intended victim as a prerequisite to successful prosecution. Since success of the scheme and loss by a defrauded person are not essential elements of the crime under 18 U.S.C. §§ 1341, 1343, allegations of such consequences are unnecessary to a proper indictment. While we recognize that some courts have reached a contrary conclusion, see *United States v. Rabinowitz*, 327 F.2d 62 (6th Cir. 1964); *United States v. Baren*, 305 F.2d 527 (2d Cir. 1962) (limited to its own facts in *United States v. Andreadis*, 366 F.2d 423, 431–32 (2d Cir. 1966), cert. denied 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967)); *United States v. Brunet*, 227 F.Supp. 766 (W.D.Wis. 1964), we find that the better view, and the majority view, requires no actual loss to victims. See *United States v. Gross*, 416 F.2d 1205 (8th Cir. 1969), cert. denied 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1970); *Deaver v. United States*, 81 U.S. App.D.C. 148, 155 F.2d 740, cert. denied 329 U.S. 766, 67 S.Ct. 121, 91 L.Ed. 659 (1946). To hold otherwise would lead to the illogical result that the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim.

## Sufficiency of the Evidence

■ Appellants additionally argue that the evidence adduced at trial was insufficient to prove all the elements of the crime beyond a reasonable doubt. All parties agree that a conviction for mail or wire fraud requires proof of a scheme to defraud and the mailing or transmission by wire of a document or communication for the purpose of executing the scheme. See *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362–63, 98 L.Ed. 435, 444 (1954). We find that the evidence was more than sufficient to allow the jury to conclude that the defendants were guilty as charged beyond a reasonable doubt. See *United States v. Harris*, 140 U.S.App.D.C. 270, 435 F.2d 74 (1970), cert. denied 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971).

The only substantial question, raised by Pollack, pertains to whether the mailings and transmissions charged in the indictment can be considered to have been made "for the purpose of executing the scheme" within the meaning of that phrase in *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). In that case, the Court held that although use of the mails need not be contemplated as an essential element of a culpable mail fraud scheme, *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362–63, 98 L.Ed. 435, 444 (1954), the mailings must occur prior to the fruition of and bear a sufficient connection to the realization of the scheme to be considered as made for the purpose of executing the scheme. Thus the Court reversed a conviction under the mail fraud statute where the mailings of accounts between an issuer of a credit card and a proprietor who accepted the card in payment for services postdated the fraudulent use of the card to procure services and bore no relation to that procurement.

As charged in the indictment, the scheme in which appellants were involved was in-

tended to defraud shareholders and prospective shareholders of Control Metals and to obtain money and property by false pretenses. We find no difficulty in holding that the mailings referred to in counts 6 through 8 or the wire transfers in counts 9 through 11 were made for the purpose of executing the proven scheme. These mailings and transfers contained proceeds of the sale of Control Metals stock and thus fell squarely within the intended goal of obtaining money or other valuable consideration for stock.

The mailings alluded to in counts 1 through 5, however, contained only confirmations of the sale of certain Control Metals stocks. Pollack seems to argue that confirmation of a sale was neither a necessary nor a reasonably connected element of the scheme to obtain property and money and therefore these mailings cannot be considered to have been made for the purpose of executing the scheme. Nevertheless, we believe that *Maze* itself provides support for upholding the convictions under these counts. The letters of confirmation mentioned in the indictment were all mailed by September 29, 1969. Cash proceeds, however, continued to arrive by mail until November 19, 1969. Thus, the scheme had not reached fruition when the letters of confirmation were sent. Compare 414 U.S. at 402, 94 S.Ct. at 649–50, 38 L.Ed.2d at 609–10. Furthermore, in limiting the scope of the mail fraud statute, the Court in *Maze* distinguished the situation where mailings are made subsequent to achievement of the purpose of the scheme in order to "lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." 414 U.S. at 403, 94 S.Ct. at 650, 38 L.Ed.2d at 610. See *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). In this case, appellants were aided by the confirmation letters which helped to assure purchasers of the stock that a valid sale had been made and thus allow appellants to continue their sales without attracting unwanted attention to any irregularities.[6]

### The Charge to the Jury

Appellants urge that ten different errors and omissions in the district court's instructions to the jury permitted convictions under improper standards and deprived appellants of substantial defenses. We need not discuss each challenge. The charge read as a whole, as it must be, accurately and sufficiently conveyed to the jury the legal standards that had to be satisfied before guilty verdicts could be returned. The trial court did not refuse to give any requested instructions to which appellants were entitled or that concerned legal principles that could have substantially affected the jury's deliberations or verdict. See *United States v. Bernett*, 161 U.S.App.D.C. 363, 495 F.2d 943 (1974).

The one questionable instruction to which appellants took exception is the trial court's charge that if the jury found that appellants were "promoters of stock" of Control Metals Corporation, then the appellants stood in a fiduciary relation to stockholders and potential stockholders which required appellants to disclose fully all known

---

**6.** With respect to the counts of the indictment concerning the sale of unregistered securities, it is well established that use of the mails to transmit proceeds or confirmation of the sale of such securities violates section 5 of the Securities Act of 1933, 15 U.S.C. § 77e(a)(1). See *United States v. Wolfson*, 405 F.2d 779, 783–84 (2d Cir. 1968), cert. denied, 393 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969) and cases cited therein. Sachs's contention that there was insufficient evidence that he "engaged in the sale of unregistered securities or that unregistered securities were sold on his behalf by someone in privity with him" is irrelevant even if accurate. Conviction of Sachs did not depend on any acts done specifically by him or those in "privity" with him. Sachs was accused of participation in and aiding and abetting a scheme to defraud in which the sale of unregistered securities played a material role. In this context, Sachs was chargeable with the acts of his confederates if he knowingly associated himself with the illicit activity, participated in the general venture to accomplish the criminal goal, and sought by his action to bring about that goal. See *United States v. Barlow*, 152 U.S.App.D.C. 336, 470 F.2d 1245 (1972).

facts that might influence prospective shareholders. Appellants maintain that there was no evidence that they were promoters of the corporation and that unwarranted imputation to them of a fiduciary obligation imposed an undue standard of conduct on them. Presumably, appellants suggest that the promoter instruction improperly permitted the jury to infer fraud from breach of an inapplicable fiduciary responsibility.

There might be some merit in appellant's argument if this charge stood in isolation. The jury, however, was properly instructed to consider the charge as a whole. Throughout his charge to the jury, Judge Gasch reiterated that actual fraud, defined in terms of specific intent and willfulness, was necessary to support a conviction. Thus, even if the jury had believed that appellants were promoters, they could not have returned guilty verdicts unless they also found the requisite calculated deception that would have supported convictions regardless of whether the defendants or any of them were promoters. See *Post v. United States*, 132 U.S.App.D.C. 189, 407 F.2d 319 (1968), cert. denied 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784 (1969). Cf. *United States v. Park*, 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489, 502–03 (1975).

### *The Government's Obligation Under Brady v. Maryland*

#### A. Disclosures Untimely Made

Appellants make multiple allegations concerning the government's noncompliance with the disclosure requirement of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Several of these allegations refer to suppression by the government of evidence claimed to be favorable to the defense while other claims refer only to the timing of disclosures that were made.

Appellant Sachs has raised the issue of untimely disclosure with respect to several items of evidence that would allegedly ex-

culpate him, inculpate others, or cast doubt upon the motive and credibility of witnesses. Thus he claims that not until one day prior to opening argument did the government reveal that a complaint for injunction had been filed in 1970 naming Lindauer as a defendant in a scheme similar to the one in the present case; that only on November 16, 1973 did the government produce SEC transcripts of a witness, Sullivan, and another party, Rapp, that revealed Lindauer had supported Pollack's claims concerning the value of the onyx claims and that neither Sullivan nor Rapp implicated Sachs; that not until Hall had completed his testimony and returned to Arizona did the government reveal that he remained as a member of the board of directors of Control Metals when the corporation entered its agreement with Pollack; and that the government delayed until the eve of trial before revealing that Raymond Carroll, a stockbroker for P. J. Gruber and Company, had previously stated that he received his instructions regarding sale of Control Metals stock from a party other than Sachs.

 Disclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure. See, e. g., *United States v. Elmore*, 423 F.2d 775, 779 (4th Cir. 1970); *United States v. Deutsch*, 373 F.Supp. 289, 290–91 (S.D.N.Y.1974). The trial judge must be given a wide measure of discretion to ensure satisfaction of this standard. While some courts have held that *Brady* affords no pre-trial discovery rights to defendants, see *United States v. Moore*, 439 F.2d 1107 (6th Cir. 1971); *United States v. Manhattan Brush Co.*, 38 F.R.D. 4 (S.D.N.Y.1965), we believe that application of a strict rule in this area would inevitably produce some situations in which late disclosure would emasculate the effects of *Brady*[7] or other situations in which premature disclosure would unneces-

---

7. See Note, The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant, 74 Yale L.J. 136, 145 (1964).

sarily encourage those dangers that militate against extensive discovery in criminal cases, e. g. potential for manufacture of defense evidence or bribing of witnesses. Courts can do little more in determining the proper timing for disclosure than balance in each case the potential dangers of early discovery against the need that *Brady* purports to serve of avoiding wrongful convictions. We cannot say in this case that the possibility of such convictions was heightened by the timing of the government's disclosures.

Lindauer's previous confrontation with government officials had resulted in a final consent order in which all defendants neither admitted nor denied the allegations contained in the complaint. The value of such evidence to Sachs's theory that Lindauer was involved in the instant scheme, therefore, was quite limited. Moreover, despite the alleged tardiness of the revelation, defense counsel engaged in extensive cross-examination of Lindauer on what the government euphemistically terms "this embarrassing interlude." Whatever additional examination could have been produced by earlier revelation of Lindauer's previous difficulties would not have introduced an element of reasonable doubt of Sachs's guilt into the jury deliberations. There can be no complaint that nondisclosure regarding Lindauer prejudiced Sachs as it is obvious that appellant fully exhausted the subject.

Revelation of Sullivan and Rapp's previous statements was similarly timely. Although the government could have withheld Sullivan's SEC testimony until after the witness had taken the stand in this case, 18 U.S.C. § 3500, the prosecutor allowed appellants to examine Sullivan's statements nearly two weeks prior to that time. Rapp's previous testimony was disclosed to the defense but no use was made of it at trial. Furthermore, the SEC testimony revealed only that Rapp and Sullivan had not dealt directly with Sachs. The government never contended otherwise; it always contended that Rothman handled the actual

disposition of Sachs's Control Metals stock, but with Sachs's knowledge and consent.

The claim of prosecutorial misconduct in withholding evidence concerning Carroll, the P. J. Gruber and Company stockbroker, and Hall is completely belied by the record, which reveals that the defense was fully apprised of the material prior to trial.

### B. Motion for a New Trial

Sachs has moved for a new trial pursuant to Fed.R.Crim.P. 33, contending that "newly discovered evidence" reveals that the government also failed to fulfill its obligations under *Brady* by not divulging at any time information that allegedly would have tended to impeach major government witnesses. The district court denied the motion on the ground that the new evidence was only cumulative and exhibited no violation of the government's *Brady* obligations. We affirm that holding.

Sachs argues that the government concealed that Gold, who implicated Sachs in the dissolution of Fountainhead and the distribution of shares of Control Metals stock, had previously been indicted in Tennessee for harboring a fugitive and that the charges against Gold were dropped within a day of his appearance before the grand jury in this cause. Sachs also suggests that the government should have revealed that Gold had previously been named as an unindicted co-conspirator in a fraud case in the Eastern District of New York in 1972, since this information would have been useful to question Gold's credibility.

Sachs contends that the government concealed similar information with respect to Michael Gardner. Sachs claims recently to have discovered that Gardner was arrested in Illinois in 1972 and charged with participation in a conspiracy to steal and dispose of treasury bills. Gardner had been granted immunity in exchange for his cooperation in the Illinois investigation, but that grant was withdrawn and Gardner was later prosecuted and convicted, and in April 1974, after he had testified in this case, he was sentenced to three years' imprisonment on the charges.

■ *Brady* imposes upon the government the obligation to reveal evidence within its possession that is material to the guilt of the accused. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218–19 (1963). Broad as this mandate may be, it does not require that all information concerning government witnesses be made available to the defense. In this case the "newly discovered evidence" did not bear on the veracity of the Control Metals stock transactions, but tended only to show that the witnesses Gold and Gardner were not paragons of virtue. Thus the evidence had no bearing on whether appellants had taken part in the fraudulent scheme. The information that Gold and Gardner had been indicted, and that Gold had been named as an unindicted co-conspirator in unrelated cases would not have been admissible for purposes of impeachment, see *United States v. Lee*, 166 U.S. App.D.C. 67, 509 F.2d 400 (1974), cert. denied 420 U.S. 1006, 95 S.Ct. 1451, 43 L.Ed.2d 765 (1975), *Tinker v. United States*, 135 U.S.App.D.C. 125, 417 F.2d 542, cert. denied 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118 (1969), Fed.R.Evid. 609. Furthermore, with respect to Gardner, this newly discovered evidence was at best cumulative. At trial, Gardner was subjected to a rigorous voir dire that exposed to the defense virtually all of the material information, including a prior conviction of Gardner in New York, now claimed to have been concealed.

We further reject the suggestion that the timing of the dismissal of the indictment against Gold in Tennessee and the proceedings against Gardner in Illinois implies that these witnesses made deals with the government for their testimony in this case and that those deals were concealed from the defense. See *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The transcript of Gardner's sentencing proceedings in Illinois, which has been made part of the record in this case, reveals that the trial judge there had received no communication from the Department of Justice recommending leniency because of Gardner's cooperation in Washington, Similarly, exhibits introduced into the record by Sachs reveal that the dismissal of the indictment against Gold was based on, *inter alia*, Gold's cooperation in the successful prosecution of organized crime figures in New York. Gold's testimony in the New York case in which he was named as an unindicted co-conspirator preceded the Department of Justice investigation of the Control Metals stock transactions, and thus he could not have been promised a deal in one case for his cooperation in the other.

Finally, Gardner and Gold were only two persons in a long parade of witnesses produced by the government to implicate all the appellants. There is no reason to believe that disclosure before trial of this information regarding these other activities of Gardner and Gold could have been used in such a way as to lead the jury to entertain a reasonable doubt about the defendants' guilt. *United States v. Agurs*, 167 U.S.App.D.C. 28, 510 F.2d 1249 (1975), *Levin v. Clark*, 133 U.S.App.D.C. 6, 408 F.2d 1209 (1967). Obviously, the same evidence would not "probably produce an acquittal" sufficient to require a new trial under Rule 33. *Thompson v. United States*, 88 U.S. App.D.C. 235, 236, 188 F.2d 652, 653 (1951). See *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217, 1222 (1959).

### Miscellaneous Claims

■ The remainder of appellants' claims are without merit. The trial court's rulings on the admission of evidence and limitations on cross-examination were not an abuse of the trial court's discretion in such matters. There is no basis for Pollack's claim that he was denied effective assistance of counsel by the trial court's denial of his motion for a continuance. The extensive record in this case strongly suggests that time constraints did not prevent Pollack's counsel from acting as a diligent conscientious advocate. See *United States v. DeCoster*, 159 U.S. App.D.C. 326, 331, 487 F.2d 1197, 1202 (1973).

■ Finally, we hold that the district judge's denial of Sachs's motion under Fed.

R.Crim.P. 16(a) to inspect writings made by third persons that attributed inculpatory statements to Sachs was consistent with the logic of the Rule and previous decisions. See *United States v. Feinberg*, 502 F.2d 1180 (7th Cir. 1974), cert. denied 420 U.S. 926, 95 S.Ct. 1122, 43 L.Ed.2d 396 (1975); *United States v. Kenny*, 462 F.2d 1205, 1212 (3d Cir. 1972), cert. denied 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1973); *United States v. Wilkerson*, 456 F.2d 57, 61 (6th Cir.), cert. denied 408 U.S. 926, 92 S.Ct. 2506, 33 L.Ed.2d 337 (1972). Rule 16(a) allows the defendant "to inspect and copy or photograph: any relevant (1) written or recorded statements or confessions made by the defendant . . . within the possession, custody or control of the government . . . ." The phrase "by the defendant" however, requires not that the statement at issue be attributed to the defendant although, as here, related by a government witness, but that the statement be obtained by the government directly from the defendant without the intervention of any third party. A contrary interpretation of the Rule would present a conflict with 18 U.S.C. § 3500. This same conclusion is suggested in the Notes of the Advisory Committee on Rules explaining a 1966 amendment of Rule 16, which states that the defendant need not designate with precision the statements that he seeks to discover "because he may not always be aware that his statements or confessions are being recorded."

*Affirmed.*