**UNITED STATES of America**

v.

**Seymour POLLACK and Paul M. Sachs.**

**Crim. No. 549–73.**

United States District Court, District of Columbia.

April 13, 1976.

Robert Ogren and Brian Shaughnessy, Asst. U. S. Attys., Washington, D. C., for United States of America.

Warren Magee, Washington, D. C., for defendant Pollack.

Thomas Smith, Langley Park, Md., for defendant Sachs.

## MEMORANDUM

GASCH, District Judge.

On or about October 10, 1975, the Court received an Order of the United States Court of Appeals to the effect that Mr. Seymour Pollack's motion in that Court for remand to this Court to consider Mr. Pollack's motion for new trial was denied without prejudice to Mr. Pollack's opportunity to make such a motion in this Court. Under the doctrine of *Smith v. Pollin,* 90 U.S. App.D.C. 178, 194 F.2d 349 (1952), this Court proceeded to hear such evidence as Mr. Pollack sought to produce subject to limitations of materiality and relevance. Due to the fact that Mr. Pollack, although represented by Mr. Warren Magee, his retained trial counsel,[1] insisted upon repre-

---

1. Mr. Magee, due to Mr. Pollack's contention of indigency, was appointed under the provisions of the Criminal Justice Act to represent Mr. Pollack during this hearing.

senting himself, the hearing on his motion for new trial became protracted. Hearings were held on the following days: October 10, November 7, 13, 17, 18, 20, 25 and 26; December 9, 10, 11, 19 and 22, 1975; January 9, 12, 13 and 22; February 2, 3, 4, 5, 6, 1976.

The following principal contentions emerged from Mr. Pollack's presentation: that the government relied upon evidence stolen from Mr. Pollack in violation of his constitutional rights; that he was denied *Jencks* material; and that he was denied *Brady* material. From the evidence adduced, the Court makes the following

## FINDINGS OF FACT

1. In November, 1969, Mr. Pollack surrendered himself in California to commence service of a sentence imposed by a state court on the charge of fraud. Prior to this, he maintained an office in the 1000 block of Connecticut Avenue. This office he shared with Robert G. (Bobby) Baker. One Georgia Liakakis served as secretary to these men. In January, 1971, Mr. Baker commenced the service of a sentence in the Federal penitentiary at Lewisburg, Pennsylvania. Miss Liakakis was directed by Mr. Pollack to close the Connecticut Avenue office and to take charge of certain files which had been kept there. She was assisted in this project by Mr. Joseph Gold, also a former employee of Mr. Pollack, and a witness both at the trial and the hearing.

2. Miss Liakakis not only served as Mr. Pollack's secretary and bookkeeper but acted as an officer of International Marketing Corporation and of Fountainhead International, two of Mr. Pollack's corporations. Miss Liakakis was called as a witness by Mr. Pollack, but on the advice of her counsel, invoked her Fifth Amendment privilege not to testify. She was not a witness at the trial of this case, but she was called to testify in a criminal proceeding pending in the District of New Jersey in which Mr. Pollack is also a defendant. It was represented that her testimony in that case was contrary to sworn statements she had given the government.

Miss Liakakis retained possession of Mr. Pollack's files after they were removed from Mr. Pollack's office. They were maintained either at her apartment or at Mr. Baker's residence where she also went from time to time because of her employment as secretary by Mr. Baker. Neither Mr. Baker nor others at his residence knew that any of Mr. Pollack's files had been taken to the Baker residence.

Sometime after the removal of Mr. Pollack's files from his Connecticut Avenue office and while they were in the possession of Miss Liakakis, she was visited by an Internal Revenue agent, Frank Cox, who questioned her about the contents of the files and who subsequently was permitted to remove the files for examination. Before returning the files to her, he caused them to be microfilmed. She also made them available to a Congressional committee then investigating organized crime.

Although it was the contention of Mr. Pollack that Miss Liakakis was a government agent, or paid informer, as he characterized it, there is no credible evidence of this. At best, it was shown that she had an interest in cooperating with the government for the reason that she had not filed an income tax return and following this cooperation, she was not subjected to prosecution. There is no showing whatsoever that she was ever paid for her services in making these documents available to the government. She was not a witness at trial. She was not paid by the government nor was an informant file kept on her.

3. Completely independent of efforts by a Congressional committee on organized crime to review the contents of Mr. Pollack's files and efforts on the part of agent Cox of Internal Revenue to study them, the Denver Regional Office of the Securities and Exchange Commission (SEC) initiated efforts to investigate the sale and/or distribution of certain stock known as Control Metals stock, one of the principal assets of

which was said to be an onyx mine located near Phoenix, Arizona. Mr. John Kelly of the Denver Regional Office of the SEC was called by Mr. Pollack as a witness at these hearings. It was his testimony, and the Court finds, that the government had an independent source for the documents it introduced at trial, namely, the records of various transfer agents for this stock, records of brokers, banks, and corporations, etc., land records at Phoenix, Arizona, and the files of Thayer C. Lindauer, counsel for Control Metals, Inc. Mr. Kelly gave detailed information concerning the government's awareness of each of the government's pre-marked trial exhibits prior to the criminal reference by the SEC to the Department of Justice in November, 1971. He stated that most of the government's evidence was accumulated during the SEC investigation in 1969. This testimony was corroborated by Mr. Ogren, the prosecutor who also was called as a witness by Mr. Pollack in the hearing on this motion. The Court credits and accepts the testimony of these witnesses.

4. Defendant's trial commenced in this Court on or about November 19, 1973. On or about January 4, 1973, the government, with a subpoena, took possession of some, but not all, of Mr. Pollack's files then in the possession of Miss Liakakis. This was subsequent to the accumulation of the documents obtained by Mr. Kelly of the Denver Regional Office of the SEC, which documents were used by the government in trial. The documents subpoenaed from Miss Liakakis were not used by the government at trial nor did they lead to evidence used at trial.

5. Miss Liakakis maintained possession, either actual or constructive, of the documents of Mr. Pollack and those pertaining to corporations controlled by him until they were turned over to the government on January 4, 1973, pursuant to a Grand Jury subpoena. At no time did Robert G. Baker have custody, possession or control of these documents nor did he know where they were alleged to have been until told by Mr. Pollack. There is no credible evidence that any of these documents were taken by the government or any agent of the government from Mr. Baker's residence.

6. On June 25, 1973, Mr. Sachs was arraigned, and the following day, Mr. Pollack was arraigned. At a pretrial conference on July 6, 1973, defendants were given 30 days within which to file motions, and the government 10 days within which to file its opposition. Various defense motions, including those for discovery, for bill of particulars, and for production of Grand Jury testimony, were heard on September 26th. On October 2nd, defense motions were denied and a pretrial conference was set for November 2nd. In denying defendant's motion for discovery and for bill of particulars, the Court followed its usual practice of telling the government to make discoverable materials available to the defense. This the government agreed to do. Mr. Karl Feissner, counsel for Mr. Sachs, did engage in extensive discovery and the copying of materials made available to him, as his praecipes in part reflect. Although reminded of the opportunity for discovery, neither Mr. Pollack nor his counsel, except on a few occasions, took advantage of this opportunity.

7. Among motions filed by counsel for Mr. Pollack was a motion for the production of tapes or transcriptions of electronic surveillance. The government denied that it had subjected Mr. Pollack to any electronic surveillance but said that if there were any such tapes, they were made by Mr. Pollack himself. It subsequently developed that in the materials taken from Miss Liakakis there were a number of tapes which have been produced in this Court together with the transcriptions of the same. It appears from the testimony of Mr. Pollack himself that it was his practice to record certain telephone conversations, as well as other conversations and that he had a specially designed briefcase which contained electronic recording equipment. There is no showing that any of this material had any relevance to the issues before the Court for trial, with one exception.

8. This exception is a tape recorded by Mr. Pollack of a conversation he had with one Larry Nicholson. This conversation related to the manipulation of Control Metals stock. There was some reference in this transcription to Mr. Sachs. Nothing on this transcription could be considered exculpatory of either of these defendants. Though Mr. Pollack contended that the government had tampered with these tapes, nothing was brought to the attention of the Court to substantiate this charge. Mr. Nicholson was well known to Mr. Pollack and his participation was in no sense "newly discovered." He could have been called as a witness by either defendant but for the fact (as Mr. Pollack himself disclosed at the hearing) his attorney suggested he leave the country in order to avoid prosecution until the statute of limitations ran. No use was made of these tapes by the government at trial, nor was there any showing that they would have been of any assistance to the defense. They concerned generally other matters than those involved in the Control Metals case.

9. Though a cart full of documents was produced as a result of various subpoenas duces tecum served on the government by Mr. Pollack during the course of this hearing, the Court's attention was not drawn to any document claimed by Mr. Pollack to have been suppressed by the government which would have been material to his defense in this case. Emphasis was placed upon certain SEC material and other evidence derogatory to the activities of Michael Gardner, an associate of Mr. Pollack and a witness called by the government at trial. Both defense counsel joined in this position. It is noted, however, that Mr. Feissner, trial counsel for Mr. Sachs, fully explored at trial the nature and character of this SEC material and questioned Mr. Gardner concerning it as well as concerning criminal charges. Further reference to it was believed by the Court to concern material cumulative in character and for that reason, further access was denied. The trial case has now been affirmed on appeal. See *United States v. Pollack*, D.C.Cir., 534 F.2d 964 (Nos. 74–1455 and 75–1451, 1976).

10. Reliance is also placed by Mr. Pollack on a certain SEC correspondence file kept by Mr. Lester Green. The Court reviewed this correspondence file *in camera* since it related almost entirely to other persons and matters than those in which these defendants were concerned. The few letters which do pertain to these defendants are not in any sense exculpatory nor were they in the possession of the U.S. Attorney.

11. Mr. Pollack also contended that his confidential relationship with his counsel, Welch & Morgan, was violated when certain letters written by a member of that firm to him were taken by the government pursuant to a subpoena served on Miss Liakakis by the government. Nothing of any material value either to Mr. Pollack's defense or to the government's prosecution of Mr. Pollack was contained in any of this correspondence. Furthermore, in it no reference is made to any admissions by Mr. Pollack. It is also noted that this material was discovered to a third party, Miss Liakakis. Accordingly, the Court rejects Mr. Pollack's contentions of confidentiality and productivity.

12. Mr. Pollack also contended that the government violated his confidential relationship with his attorney, Mr. Joseph Gold, by calling Mr. Gold as a witness at the trial. The record reflects that Mr. Gold at the time he was employed by Mr. Pollack was a New York lawyer then under suspension by the courts of that jurisdiction. He performed certain tasks for Mr. Pollack and Mr. Pollack's corporations, some of which had legal significance, but it was not shown that Mr. Gold was called upon by Mr. Pollack to render legal opinions or legal advice personal to Mr. Pollack or material to his defense or the government's prosecution of Mr. Pollack. On what was submitted the Court finds no violation by the government of any confidential lawyer-client relationship existing between Mr. Pollack and Mr. Gold. Testimony by Mr. Gold was voluntarily given and not coerced by the government. There was no credible evidence to support Mr. Pollack's contention that docu-

ments belonging to him were stolen from Mr. Gold's automobile.

13. Mr. Pollack also contended that certain documents relating to Control Metals were unlawfully taken from his possession at his Ft. Lee residence by a Postal Inspector named Mr. Liddle and a Mr. Cuddy of the Department of Justice. This contention is contradictory to the testimony given by Mr. Pollack in the New Jersey hearing on September 4, 1975. It is also contrary to testimony given by Mr. Cuddy and Mr. Liddle. The Court credits their testimony.

14. Mention was made in one of the thousands of documents produced as a result of Mr. Pollack's various subpoenas duces tecum of a "Mr. Flagg." If such a person exists, there was no showing that he could add any material evidence to this case.

15. Prior to trial and at a time when Mr. Pollack was contending that charges against him should be dismissed for failure to accord him a speedy trial, he was seeking further delay by alleging a serious heart condition. The focal point of the inquiry was a heart attack which Mr. Pollack alleged took place in Newark, New Jersey, on November 1, 1973. The attending physician's report was forwarded to this Court. The government brought down a heart specialist from New York City who had examined Mr. Pollack there in connection with a case pending in Federal court. This Court appointed a heart specialist in this City to examine Mr. Pollack and to give testimony. The defense also arranged for an examination and testimony by a heart specialist. Mr. Pollack's motion for severance and continuance was heard and extensive testimony from these three heart specialists was taken. The hearing took approximately two days. The Court was and is satisfied that Mr. Pollack was able to proceed without impairment to his health and the motions were denied.

16. Whatever information is contained in the various prison hospital files in the prisons where Mr. Pollack has been confined is not newly discovered. The Court questions whether it could add anything to what was presented to the Court at the hearing. In observing closely the activities of Mr. Pollack from time to time both during the trial and particularly during this hearing, the Court has been impressed by his prodigious energy, his alertness, and his vigorous advocacy. His condition then did not warrant a continuance nor does it at the present time indicate any diminution of flow of energy.

17. Mr. Pollack has referred to what he describes as a "mail cover." There is no showing that the government either resorted to such a technique or obtained any evidence material to the case tried in this Court by this expedient.

18. It is another of Mr. Pollack's contentions that he was interviewed while in prison without being given the required *Miranda* warnings. He conceded in a colloquy with the Court that he had made no incriminating statements nor were any brought to the attention of the Court.

19. *Jencks* material was given the defense either before or immediately after a witness for the government testified. Extensive use of such material was made. There has been no showing that the defense was denied access to such material. The Court credits the testimony of Mr. Ogren and Mr. Kelly.

20. In connection with his plea of guilty, the codefendant Rothman turned over certain material to the government. This material was made available to the defense, and was examined by Mr. Feissner. It was equally available to Mr. Pollack and his counsel.

21. Mr. Pollack, while a prisoner at Danbury, Connecticut, indicated he wished to appear before the grand jury investigating this case. Pursuant to his request, he was brought to this District. Thereafter he decided not to appear before the grand jury. He now questions the manner in which he was transported and lodged in jail. The Court finds no failure on the part of the government to follow appropriate procedures.

22. Mr. Pollack, on cross-examination at this hearing, admitted that he was the same person who was convicted on December 3, 1969, of grand theft by the State of California, and the same person who was convicted on May 12, 1972, in the Southern District of New York of mail fraud and conspiracy to violate the mail fraud statute, and the same person who was convicted of various counts, including conspiracy, mail fraud, fraud in the sale of securities, fraud by wire, and transportation of securities taken by fraud, in the Northern District of Alabama, Southern Division, on July 15, 1971. These may be considered by the Court in evaluating his credibility.

23. Mr. Sachs, while present and represented by counsel throughout these extensive hearings, maintained a noticeably low profile. He indicated that he adopted some of the positions taken by Mr. Pollack and for that reason the same findings heretofore made would be applicable to him, with the exception of Finding No. 22. Significantly, Mr. Sachs did not take the stand as a witness in his own behalf. In his proposed findings and conclusions he has asked that consideration be given to a number of exhibits, some of which, it is said, came from the so-called Liakakis documents. The Liakakis documents as such were not offered or received in evidence in the trial. Some of them are duplicative of exhibits obtained earlier by the government from independent sources, which were offered and received in evidence. Mr. Sachs' exhibits in the hearing, nos. 7, 8, and 9, said to have been taken from the so-called Liakakis documents are statements which counsel now says Mr. Sachs was entitled to as his statements under Fed.R.Crim.P. 16. These statements appear to have very little to do with the case which was tried. No. 7 is a telegram from Mr. Sachs to Mr. Pollack with respect to an Ocean City, Maryland, transaction which had nothing to do with the Control Metals case and presents a demand on the part of Mr. Sachs that Mr. Pollack pay him for legal services rendered. No. 8 is a letter from Mr. Sachs to Mr. Pollack, again demanding that his legal fees be paid. No. 9 is a photocopy, almost illegi-ble, of a handwritten letter from Mr. Sachs to Mr. Pollack which the government denies was part of the Liakakis material or that it was shown on the Cox microfilms. Again Mr. Sachs makes demand for the payment of his legal fees. That Mr. Pollack should have paid Mr. Sachs is clear, but this fee dispute between these two friends, while unfortunate, is of no probative value insofar as the merits of the case are concerned. That these urgent demands for compliance with Rule No. 1 existed among the mountains of paper that have accumulated in this case is of no significance in ruling upon the motion for new trial. It does not negative the existence of a conspiracy or show that Mr. Sachs' connection was solely that of a lawyer.

24. Mr. Sachs, with Mr. Pollack, also contends that certain other exhibits are in the nature of *Brady* material. In this regard reliance is placed upon a transcript before the Securities and Exchange Commission of Miss Liakakis' testimony in 1970. Miss Liakakis was not a government witness at trial. On voir dire at the request of the defense her name was disclosed to the jury panel as a possible witness. She elected to take the Fifth Amendment when called as a witness by Mr. Pollack at this hearing. The Court has read the Securities and Exchange Commission transcript referred to by Mr. Sachs' counsel. Had Miss Liakakis been called as a witness and testified at the trial contrary to the testimony contained at page 35 of the transcript, obviously the transcript could have been used to refresh her recollection or to impeach her credibility. Since she did not take the stand as a witness, her SEC testimony contained at page 35 is of no importance. Her testimony contained at page 41 of the transcript simply reflects Miss Liakakis' conclusion as to Mr. Sachs' involvement with the Control Metals transaction. She had previously testified that Mr. Sachs had business dealings with Mr. Pollack; that they were on the phone quite a lot, and that Mr. Pollack consulted Mr. Sachs, but she stated she really didn't know what Mr. Sachs was doing with Mr. Pollack. At the page men-

tioned by Mr. Sachs' counsel, she mentioned getting a check from Mr. Sachs in the amount of $15,000 which she was instructed by Mr. Pollack to cash and to wire it to him in New York by Western Union. This material is not exculpatory nor is failure to deliver it to Mr. Sachs a violation of the standards set by the Supreme Court either in the *Brady* case or in *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

## CONCLUSIONS OF LAW

### I. *Independent Source.*

Evidence introduced at trial by the government was obtained from the investigation of the Denver Regional Office of the Securities and Exchange Commission, which took place largely in 1969. This investigation was conducted by Mr. John Kelly of that office. Information was obtained from the stock transfer records of Control Metals Corporation and conferences with Mr. Thayer Lindauer, counsel for Control Metals Corporation, and certain officials of that organization. It also included bank records and brokerage records. Land Records for the State of Arizona at Phoenix were also examined. The Court concludes it was these records and testimony relating thereto which were introduced in evidence and which formed the basis for the jury's verdict in this case.

■ Assuming without deciding that Mr. Pollack's contention is correct—that the government illegally came into possession of his documents—this assumption lends no assistance to Mr. Pollack's case. As the Supreme Court stated in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) and reaffirmed in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963):

The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. *Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others,* but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed. 251 U.S. at 392, 40 S.Ct. at 183; 371 U.S. at 485, 83 S.Ct. at 416 [Emphasis added].

The investigation that was conducted by the Denver Regional Office of the SEC yielded the records and information on which the government relied to prove the facts in this case. The SEC investigation was not connected in any way with the alleged seizure of Mr. Pollack's documents and therefore provided an evidentiary source entirely independent of the government's allegedly illegal act of seizure. In short, the Court concludes that the evidence adduced by the government did not derive from the exploitation of any illegality. See also *Baker v. United States,* 139 U.S.App. D.C. 126, 430 F.2d 499, 503, *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970).

### II. *The Liakakis Documents.*

■ The records and documents to which Mr. Pollack has voiced strong objection are primarily the records of three of his corporations, Control Metals Corporation, Fountainhead Corporation, and International Marketing Corporation, as well as certain personal records of his. These records he turned over to his secretary-bookkeeper, Georgia Liakakis, who had also served as an officer of some of his corporations. She continued to perform certain duties with respect to these corporations after Mr. Pollack surrendered himself at the state prison in Lompoc, California, in late November, 1969. Under these facts the Court concludes that Mr. Pollack effectively surrendered possession of the records to Miss Liakakis, and that in surrendering possession to Miss Liakakis, Mr. Pollack abandoned any reasonable expectation of privacy he may have entertained as to the documents. Accordingly, Mr. Pollack's Fourth Amendment rights were not violated by the delivery of those documents to the governmental agents. See *Couch v. United States,* 409 U.S. 322, 336 n. 19, 93 S.Ct. 611, 34 L.Ed.2d

548 (1973); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■ With respect to Mr. Pollack's claim that the government violated his Fifth Amendment rights by obtaining his documents, the Court notes the words of Justice Holmes in *Johnson v. United States,* 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919 (1913): "A party is privileged from producing the [self-incriminating] evidence, but not from its production." *Id.* at 458, 33 S.Ct. at 572. See also *California Bankers' Ass'n v. Shultz,* 416 U.S. 21, 55, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). The governmental agents' actions in obtaining the documents from Miss Liakakis involved no semblance of governmental compulsion against Mr. Pollack's person. Accordingly, no violation of Mr. Pollack's Fifth Amendment rights occurred. See *Couch v. United States,* 409 U.S. 322, 336, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). No Fifth Amendment claim could be premised, in any event, on the corporate records that were handed over by Miss Liakakis, for no Fifth Amendment privilege may be claimed by individuals or corporations with respect to corporate records. See *Bellis v. United States,* 417 U.S. 85, 88, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974); *California Bankers' Ass'n v. Shultz,* 416 U.S. 21, 71, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974). Since there was no reasonable expectation of privacy and no semblance of governmental compulsion against the person of Mr. Pollack, the actions taken by these governmental agents were not unlawful.

■ Even if Georgia Liakakis stole Mr. Pollack's documents and made them available to the government, as Mr. Pollack implies, this would not preclude their use by the government unless Miss Liakakis were a government agent. There is no proof of this, however. Documents taken from Miss Liakakis were received pursuant to a grand jury subpoena. See *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921).

### III. *Brady Material.*

■ Defense counsel were given extensive access, pretrial and during the trial, to documents in the possession of the government pertaining to this case with the exception of *Jencks* material, but the latter was made available prior to the time the witness testified or directly after his direct testimony. No exculpatory material in the government's possession was shown to have been withheld from the defendants. The Court concludes there was no violation of the standards established in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1960). There is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all investigatory work on a case. *Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

### IV. *"Newly Discovered" Evidence.*

■ Evidence produced during the course of this extensive hearing was neither newly discovered nor of such character, whether viewed separately or collectively, that it would probably produce an acquittal. *Thompson v. United States,* 88 U.S.App.D.C. 235, 188 F.2d 652 (1952); *United States v. White,* 168 U.S.App.D.C. 309, 514 F.2d 205 (1975).

### V. *Attorney-Client Privilege.*

■ The Court further concludes that there was no violation of Mr. Pollack's attorney-client privilege for the reason that the communications did not relate to anything revealed by Mr. Pollack to his counsel which was confidential in character. *United States v. Silverman,* 430 F.2d 106, 121 (2d Cir. 1970). It concerned information which his attorney got from others and that is not privileged. *Foley & Co. v. Vanderbilt,* D.C., 65 F.R.D. 523, 526 (1974).

### VI. *Mr. Sachs' Statements.*

■ Mr. Sachs' reliance on Fed.R. Crim.P. 16 is misplaced. His statements, which he says were withheld from him, were not obtained by the government directly from the defendant without the in-

tervention of any third party. *United States v. Pollack and Sachs,* Nos. 74–1455, 1451, 1460, 1157, 1154, in the United States Court of Appeals for the D.C. Circuit, decided March 31, 1976, 534 F.2d 964.

Accordingly, the motion for new trial is denied as to both Mr. Pollack and Mr. Sachs.