**UNITED STATES of America**

v.

**John M. POINDEXTER.**

**No. Cr. No. 88–0080–01 (HHG).**

United States District Court,
District of Columbia.

Oct. 24, 1989.

See also 719 F.Supp. 6.

14

Lawrence Walsh, Washington, D.C., for plaintiff.

Richard Beckler, Washington, D.C., for defendant.

## OPINION

HAROLD H. GREENE, District Judge.

■ Defendant has filed a number of pretrial motions, the government has filed oppositions, and the Court has received replies and voluminous appendices. In general, the motions will be denied. Several of them are subject to denial on a fairly summary basis, either because Judge Gesell of this Court ruled on the issues adversely to defendant while the Poindexter matter was still pending before him, and the rulings are therefore the "law of the case," [1] or because there is direct appellate precedent in point contrary to the position taken by defendant.

Notwithstanding these preliminary obstacles, the Court has subjected all of defendant's motions to careful analysis. Where it has concluded that a particular position taken by defendant is contrary to the law of the case or appellate precedent, it has nevertheless considered the merits, at least to the extent of satisfying itself that an injustice would not be done, in the context of this case, by following the previous rulings, or that some distinction did not exist between the situation here and that presented by the precedents. Other motions were of course considered under broader criteria. Not yet decided is defendant's motion pursuant to *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) with respect to which a number of issues are being set down for oral argument.

## I

### *Count One*

Defendant has moved to dismiss Count One of the indictment, which charges him with a violation of 18 U.S.C. § 371 by participation in a conspiracy, on two grounds: (1) that it alleges not one but several conspiracies and is therefore multiplicious; and (2) that to the extent that Count One incorporates Count Sixteen of the original indictment it fails to state an offense. The motion lacks merit and will be denied.

### *A. Multiplicity*

■ Defendant contends that Count One charges one conspiracy to make false statements and destroy documents which theoretically could have started in August 1985; another, to obstruct congressional inquiries, which began on July 25, 1986 and ended August 6, 1986; and a third, to obstruct other congressional inquiries, which began in November 1986; and that on this basis the count is fatally multiplicious.[2]

■ However, the Court concludes that Count One charges but a single conspiracy to defeat congressional inquiries into the defendants' Iran-contra activities by a variety of means, as necessary to conceal the conspirators' activities, and that this is a permissible and not multiplicious method of charging a conspiracy.[3] Neither a number of objects nor a numbers of means to effectuate those objects transforms a single conspiracy into several such agreements. See *Braverman v. United*

---

**1.** The law of the case doctrine requires that, absent extraordinary and compelling circumstances, rulings made in earlier phases of particular litigation are binding in later phases of the same lawsuit. *See International Union, UAW v. Donovan,* 756 F.2d 162, 165 (D.C.Cir 1985); *Laffey v. Northwest Airlines, Inc.* 642 F.2d 578, 585 (D.C.Cir.1980); *Laffey v. Northwest Airlines, Inc.* 740 F.2d 1071, 1082–83 (D.C.Cir.1984) *United States v. Eilberg,* 553 F.Supp. 1, 3 (D.D.C.1981).

**2.** Ordinarily two or more distinct offenses may not be charged in a single count. 1 C. Wright, *Federal Practice and Procedure: Criminal,* § 142 (2d ed. 1982); but see, Part III—E *infra.*

**3.** Contrary to defendant's contention (Reply Brief at 2–3, 7), there is no reason why a single conspiracy could not have as its object the obstruction of several legislative inquiries not overlapping as to time, into the same or of related subjects. As the Court of Appeals said in *United States v. Tarantino,* 846 F.2d 1384, 1391 (D.C.Cir.1988), the existence of a single conspiracy or multiple conspiracies is primarily a question of fact for the jury. Defendant's attempt to distinguish *Tarantino* on the basis that the indictment here charges multiple conspiracies simply assumes the result.

*States*, 317 U.S. 49, 53–54, 63 S.Ct. 99, 101–02, 87 L.Ed. 23 (1942), where the Supreme Court stated that "[w]hether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one … [On this basis, the] allegation in a single count of a conspiracy to commit several crimes is not duplicitous.…". *See also, United States v. Treadwell*, 760 F.2d 327, 336 (D.C.Cir. 1985); *United States v. Addonizio*, 451 F.2d 49, 59–60 (3rd Cir.1972).[4] In fact, a single conspiracy count which includes allegations of several objects, several means, and several overt acts is more typical of criminal litigation in the federal courts—as, for example, in indictments charging violations of the drug laws—than the segmented charges defendant claims to be the only ones warranted by law.[5]

*B. Incorporation of Count Sixteen*

Count One, as narrowed by the government in August 1989, retains as one of its objects the violation by Poindexter's then codefendant Oliver North of 18 U.S.C. § 2071(b), as alleged in Count Sixteen of the original indictment. Count Sixteen, in turn, charged that North altered or caused to be altered certain memoranda of the National Security Council (NSC) that were in his custody. Defendant argues, first, that there could be no violation because the NSC is not a "public office" within the meaning of the statute, and second, that

North did not have "custody" of the papers he allegedly falsified and destroyed. These arguments are likewise without merit.

■ It is defendant's theory that a "public" office is only one to which the public customarily comes, as, for example, a Post Office window or a welfare office. To be sure, the term "public" office could conceivably be construed to mean just that; however, it could also be taken to mean a governmental office, as distinguished from a private one. There is not the slightest reason to suppose that, when Congress sought to protect governmental documents from destruction, concealment, or mutilation, it meant to single out those offices that are customarily visited by members of the public, while leaving unprotected those offices not accessible to the public where normally the more important and vital government records are kept.

It is accordingly not surprising that the reported decisions do not bear out defendant's theory. In *Coplon v. United States*, 191 F.2d 749 (D.C.Cir.1951), the Court of Appeals for this Circuit upheld the espionage conviction of a Department of Justice employee who had concealed and removed highly secret FBI reports located in Department of Justice offices not accessible to the public. In a similar vein, in *McInerny v. United States*, 143 F. 729 (1st Cir. 1906), the First Circuit, discussing the categories of records protected by the predecessor statute of section 2071, mentioned such documents as the "report of a commanding general as to the operations of an army, or of a naval commander" [that when] "deposited or filed in the proper office, would clearly enough in the sense of

4. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the famous spokes-of-the-wheel case and the only decision cited by defendant with even marginal relevance to the issue, involved a series of totally unrelated offenses tied together only through a "common key figure." That description does not fit the charges here.

5. For similar reasons, Count One is not duplicitous or multiplicitous in the sense that different proof may be required for each of the offenses alleged as objectives, inasmuch as the evidence would go toward establishing a single offense. See *United States v. Hubbard*, 474 F.Supp. 64, 71–72 (D.D.C.1979) (single conspiracy although

the 59 overt acts constituting the means and objectives "can logically be grouped into separate categories"); *United States v. Recognition Equipment*, 711 F.Supp. 1, 7–9 (D.D.C.1989) (conspiracy charge included allegations of a kickback scheme, a scheme to replace the Postmaster General, theft of USPS property, mail and wire fraud, and corruption of USPS operations, but the court held that the indictment properly charged a single conspiracy to violate statutes and to impede the lawful functions of the USPS "by multiple and interrelated means" for the ultimate purpose of securing the contract for the defendant).

the statute be so far a record of the events to which it relates as to render a person responsible who takes it from its public place and destroys it." 143 F. at 133.[6]

These cases only acknowledge the obvious. Even if there were no such decisions, the Court would not lightly hold, absent compelling legislative history, that Congress intended to restrict the statute to the protection of the often relatively unimportant documents found in areas where the public has access while withholding that protection from the documents of the National Security Council[7] in whose integrity the public and the government have the highest interest.[8]

Defendant's argument regarding "custody" suffers from similar artificiality. There is no warrant for supposing, and no legislative history suggesting, that Congress meant to subject to punishment under section 2071 only those who are the custodians of records in the technical sense, such as clerks or librarians, but to permit others working in a government agency who have access to sensitive documents to destroy or alter them with impunity. The obvious purpose of the statute is to prohibit the impairment of sensitive government documents by those officials who have access to and control over them, and no court has ever held to the contrary. See generally, *Coplon, supra*, where the defendant was found to have custody of classified documents to which she gained access in the course of her employment as an attorney in the Internal Security Section of the Department of Justice. Not only was she not the official "custodian" of the records, but she had specifically been told that she no longer had routine access to them.

The motion to dismiss Count One is denied.

## II

### *Counts Two and Three*

Count Two of the indictment alleges that from July 21 to August 6, 1986, defendant obstructed and endeavored to obstruct inquiries being had by several committees of the House of Representatives in violation of 18 U.S.C. § 1505. This obstruction is alleged to have occurred basically in two ways: (1) by the dispatch of letters to the committees on July 21, 1986 which were false, and (2) by making arrangements for a meeting between House members and Oliver North in the course of which North made a number of false statements. Both of these activities are alleged to have been intended to obstruct the inquiry of the House committees. According to defendant, Count Two fails to state an offense on various grounds.

### A. *Failure to Inform Defendant of the Offense*

A defendant must, of course, be advised by the indictment of the specific

---

**6.** The same conclusion was reached in *United States v. North*, 708 F.Supp. 364, 369 n. 3 (D.D.C. 1988). Defendant's reliance to the contrary on *Davidson v. United States*, 292 F. 750 (3rd Cir. 1923) is misplaced, for in that case not only was the conviction affirmed, but the records were truly not public records; they were the records of a bankrupt, title to which remained with the trustee, which had merely been left with the bankruptcy referee, but had not even filed in the bankruptcy proceeding.

**7.** The Court also rejects defendant's argument that application of section 2071 to NSC documents would intrude upon the constitutionally-based doctrine of executive privilege. Defendant's Memorandum at 16–17. That statute, of course, applies only to the *unlawful* destruction or removal of official records, and as such it does not impact the functioning of the Presiden-

cy. See *Nixon v. Administrator of General Services*, 433 U.S. 425, 439–55, 97 S.Ct. 2777, 2788–96, 53 L.Ed.2d 867 (1977), where the Supreme Court held that even the required processing of Presidential papers, with no claim of criminality, did not improperly invade Executive power.

**8.** See also, 44 U.S.C. §§ 2201–2207, Presidential Records Act of 1978, whose purpose it was "to establish *public* ownership of records created by future Presidents *and their staff* in the course of discharging their official duties." (emphasis added) H.R.Rep. No. 95–1487, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 U.S.Code Cong. & Adm.News 5732, 5733. The government has asserted that it will prove at trial that NSC staff members were informed that documents in the central files of the NSC were official governmental records that could not be destroyed or otherwise tampered with.

charge against him in order to enable him to prepare a defense and to protect him against double jeopardy. *Hamling v. United States*, 418 U.S. 87, 117–18, 94 S.Ct. 2887, 2907–2908, 41 L.Ed.2d 590 (1974); *United States v. Conlon*, 628 F.2d 150, 155–56 (D.C.Cir.1980); *United States v. Shorter*, 608 F.Supp. 871, 874 n. 2 (D.D.C.1985), *aff'd.* 809 F.2d 54 (D.C.Cir.1987); *United States v. Madeoy*, 652 F.Supp. 371, 374 (D.D.C.1987). An indictment is sufficient in this regard if it contains the elements of the offense and enough detail to apprise the defendant of the particular offense with which he is charged. *Conlon, id.* at 155. *See also*, Fed.R.Crim.P. 7(c)(1). The indictment in this case meets these requirements.

■ Paragraph 11 of Count Two clearly details the elements of the offense of obstruction of Congress: that Poindexter knowingly and corruptly obstructed the due and proper exercise of the power of inquiry under which investigations were being had by congressional committees, to wit, the consideration of a proposed resolution by the committees in question, and that he did so by making and causing to be made false statements and representations to these committees, for the purpose of concealing material facts.

It may be that this paragraph is by itself adequate to protect Count Two against a claim of insufficient notice of the charges. In any event, the count contains additional specificity, for while the factual allegations contained therein are somewhat disjointed, they adequately apprise the defendant of the factual basis for the charge against which he must defend.

■ Defendant's claim focuses on paragraphs 7 through 10 of Count Two. Paragraph 7 states that defendant's July 21 letters, which referred to 1985 letters, were false and misleading because, as defendant "well knew and believed, the 1985 letters ... would not have been a truthful response to the 1986 inquiries." It is defen-

dant's position that, because Count Two does not identify the 1985 letters further or specify in what manner they were false, the allegation is vague and does not permit him properly to prepare for trial on this charge. However, the reference to "the 1985 letters" in paragraph 7, together with the reference to Robert C. McFarlane in paragraph 5 (the author of the letters), and that to previous information "provided by this office" in paragraph 6, furnish sufficient information to defendant about "the 1985 letters" to enable him to prepare his defense and to protect him against double jeopardy.[9]

Defendant further claims that paragraphs 8 through 10 fail to allege any additional acts of obstruction with the requisite specificity.[10] Paragraph 8 states that, in response to a request from the Chairman of the House intelligence committee, and "in accordance with arrangements made and approved by the defendant POINDEXTER," Oliver North met with members and staff of the committee to answer questions relating to the Iran-contra affair. Paragraph 9 goes on to allege that in the course of the meeting, North made numerous specified false and misleading statements intended to obstruct the Committee's inquiry. Finally, paragraph 10 avers that following that meeting, Poindexter, knowing that North's representations had been false, nevertheless sent a message to him stating, "Well done."

The precise discussions between Poindexter and North prior to the meeting on August 6 are not averred. However, the relevant paragraphs, in conjunction with the "Well Done" congratulation following the false statements at the meeting—about which Poindexter knew—make clear that Poindexter is alleged to have arranged for North to lie to the committee members and staff so as to obstruct their inquiry. To the extent that it might be argued that the language did not adequately inform defendant of the alleged criminality, this was

---

**9.** The Court also takes note that the 1985 letters were identified in considerable detail in Counts Five through Seven of the original indictment in this case.

**10.** It is not clear that defendant's motion would prevail even if he were correct in that claim, for Count Two would charge an offense even if it did not contain paragraphs 8 through 10.

certainly done by the juxtaposition of these factual charges with paragraph 11 which relates the facts to an obstruction. The Court concludes that paragraphs 8 through 11 as well as paragraph 7 provide the defendant with enough factual detail to enable him to prepare his defense.

### B. Due and Proper Inquiry

■■■ Defendant contends next that the congressional inquiries at issue in Counts Two and Three were insufficiently formal to be protected against obstruction, and that they lacked the necessary compulsion. It is established, however, that the statute protects preliminary and informal inquiries against obstruction as well as formal proceedings. *United States v. Mitchell,* 877 F.2d 294 (4th Cir.1989); *United States v. North,* 708 F.Supp. 385, 386 (D.D.C.1988); *see also, Rice v. United States,* 356 F.2d 709, 712 (8th Cir.1966); *United States v. Fruchtman,* 421 F.2d 1019 (6th Cir.1970). Defendant's reliance to the contrary on *McGrain v. Daugherty,* 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927) is misplaced. That case holds only that Congress may use compulsory process to exercise its power of inquiry, not that all other means for exercising that power are invalid.

■■■ In a related argument, defendant claims that the committees violated their own rules and those of the House of Representatives, and that for that reason the inquiries in question were not "due and proper" exercises of the power of inquiry.[11] However, to the extent that defendant cites authority for that claim, it stands only for the proposition that a witness from whom a committee seeks to compel answers has a right to insist that the proper procedures be followed. See, *e.g., Yellin v. United States,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963); *Liveright v. United States,* 347 F.2d 473 (D.C.Cir.1965). What the cases do not hold is that, when a congressional committee is engaged in a less

formal inquiry—as committees frequently do, in advance or in lieu of formal, sworn hearings—the witnesses are free to lie and otherwise to obstruct the body without fear of the law of obstruction. The Court of Appeals for this Circuit said in *Shimon v. United States,* 352 F.2d 449, 450 (D.C.Cir. 1965), that "Congress' concern with the obstruction of justice may not be avoided by such empty technicalities;" and the Fourth Circuit recently reiterated

> The question of whether a given congressional investigation is a 'due and proper exercise of the power of inquiry' for purposes of § 1505 can not be answered by a myopic focus on formality. Rather, it is properly answered by a careful examination of all the surrounding circumstances. If it is apparent that the investigation is a legislative exercise of investigative authority by a congressional committee in an area within the committee's purview, it should be protected by § 1505.

*Mitchell,* 877 F.2d at 300–01; see also, *United States v. Sutton,* 732 F.2d 1483, 1490 (10th Cir.1984).[12]

### C. Political Question

Defendant next contends that a scrutiny of his letters would be equivalent to a scrutiny of the President's conduct and pronouncements, and that on this basis Count Two presents a political question beyond the competence of the Judiciary under the separation of powers, *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), particularly since foreign policy and national security were implicated. *Haig v. Agee,* 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981); *C. & S. AirLines v. Waterman Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948). More specifically, he asserts that "the crux of the obstruction of Congress allegation is a statement made on behalf of

---

**11.** Among the rules allegedly violated was House Rule XI which requires committee meetings to be open to the public, compels the committees to keep a complete record of their proceedings, requires the chairman to announce the subject of the investigation at the start of

any hearing, and allows each witness to obtain a transcript of the proceedings.

**12.** The questions raised by the committees must of course be within their jurisdiction—as they were here.

and after consultation with the President ... [that] expressed the President's belief that the Administration was in compliance" [with the Boland Amendment]. Defendant's Memorandum at 24. Defendant goes on to say that, since the President had declared through his spokesmen that the NSC staff had not been in violation of either the spirit or the letter of the law, to pursue Count Two would be "to call into question" the "presidential pronouncements.... The clear implication of a guilty verdict on.... Count two would be either that President Reagan lied on these other occasions or that he had no grasp of what he was talking about in the area of foreign affairs. Either way, a showing of an absolute lack of respect for the President would result." Defendant's Memorandum at 26–27.

▇ The Court does not know at this juncture whether the defendant made his statements "after consultation with the President" nor does the Court know whether these statements represented the President's views. That may or may not have been so; at this time we have only defendant's version of his discussion with President Reagan. But see, Part V–B *infra*. In any event, the political question doctrine does not leave it to the President to determine whether a member of his staff has violated the criminal law, nor does it protect members of any branch of government from revelations of wrongdoing or ignorance.

▇ Nothing in this case would require the Court to adjudicate foreign policy issues, a subject plainly beyond its competence; all that is involved is the question whether one particular individual—this defendant—has violated the laws proscribing obstruction of Congress, a subject not beyond the Court's jurisdiction. The Supreme Court has instructed the lower courts that it would be "error to suppose that every case or controversy that touches foreign relations lies beyond judicial cognizance." *Baker v. Carr,* 369 U.S. at 211, 82

S.Ct. at 707; *see also, Japan Whaling Association v. American Cetacean Society,* 478 U.S. 221, 227, 106 S.Ct. 2860, 2864, 92 L.Ed.2d 166 (1986); *United States v. Nixon,* 418 U.S. 683, 694, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974). The political question defense is therefore rejected.

### D. Count Three

▇ Defendant claims that Count Three is based on false statements alone, and that on this basis, under *United States v. Griffin,* 589 F.2d 200, 205 (5th Cir.1979), the indictment should have alleged that the statements had the actual effect of impeding a congressional inquiry. See also, *United States v. Perkins,* 748 F.2d 1519 (11th Cir.1984). The short answer to that contention is that the obstruction statute prohibits an "endeavor to" obstruct as well as a completed obstruction. See, *United States v. Russell,* 255 U.S. 138, 41 S.Ct. 260, 65 L.Ed. 553 (1921); *United States v. Jackson,* 513 F.2d 456, 460 (D.C.Cir.1975).[13] It follows that an obstructive effect is not a prerequisite to a violation.

Beyond that, Count Three is not premised solely on false statements; several additional acts of obstruction are charged. According to the indictment, the House and Senate intelligence committees began to inquire in early November 1986 into reports that the government was selling arms to Iran, and they decided to seek the testimony of defendant Poindexter, in addition to CIA Director William J. Casey, on that issue. Arrangements were made for a meeting with Poindexter on November 21, 1986 and, in anticipation of that meeting, defendant directed his subordinates, including Oliver North, to prepare a chronology of events leading to the arms shipments, to be used at the meeting. The final version of the chronology, it is claimed, deliberately misrepresented the time the government first learned of the shipment of Hawk missiles to Iran, and in his appearances Poindexter made false statements to the con-

---

**13.** Moreover, *Griffin,* the precedent principally relied on by defendant, was recently rejected by the Fifth Circuit which had authored that deci-

sion. See *United States v. Williams,* 874 F.2d 968, 980–81 (5th Cir.1989).

gressional delegation corresponding to the chronology.

Additionally, defendant allegedly sought to obstruct the committees by deleting stored messages from his files in the NSC computer system that would have revealed his activities in relation to the Iran initiative and in the provision of assistance to the Contras. All these actions are said to have been taken with the specific purpose of obstructing the inquiries of the congressional committees and of concealing facts that were material to these inquiries and that would have prolonged them had they been truthfully disclosed. In short, the allegations in Count Three go beyond false statements; the indictment alleges that defendant committed other acts of obstruction as well, and on that basis, too, the argument based on *Griffin* must be rejected.

## E. Duplicity

Defendant finally contends with respect to Counts Two and Three that they are each impermissibly duplicitous because he is charged in each count with obstructing more than one congressional committee by more than one method. Accordingly, says the defendant, these counts must be either dismissed or modified. However, it does not follow that, because a count alleges several acts, each of which *could* constitute a separate offense, each such act *must* be charged as a separate count or be dismissed for duplicity. On the contrary, as discussed in Part I *supra,* two or more acts which could be charged as separate offenses may be charged as a single count if these acts can legitimately be characterized as part of a single, continuing scheme or course of conduct. See *United States v. Mangieri,* 694 F.2d 1270, 1282 (D.C.Cir. 1982); *United States v. Shorter,* 809 F.2d 54, 56 (D.C.Cir.1987). Indeed, a contrary rule would risk unfairness to the defendant who might otherwise be subjected to multiple punishments for a single criminal episode. Any dangers presented by the prosecution of a defendant by way of a single count with more than one allegation of criminal conduct—such as the possibility that the jury would render a guilty verdict without unanimity regarding the events in question—can be more than adequately controlled through instructions to the jury.

## III

### Counts Four and Five

Count Four of the indictment charges defendant with violation of 18 U.S.C. § 1001, in that he allegedly falsely told members of the Senate and House intelligence committees (1) that he did not learn until January 1986 that Hawk missiles had been shipped to Iran two months earlier, and (2) that he had not learned until November 20, 1986 that anyone in the United States government had prior knowledge of the shipment of such missiles to Iran in November 1985. The allegation is that defendant had, in fact, been advised by Oliver North by November 20, 1985 that such a shipment was about to take place, and in November and December 1985 that a shipment of Hawk missiles had occurred.

Count Five of the indictment charges a violation of 18 U.S.C. § 1001, in that defendant allegedly falsely told members of the Senate intelligence committee that he had not learned until January 1986 that Hawk missiles had been shipped to Iran in November 1985, when in fact Oliver North had advised him in November and December 1985 that such a shipment was about to take place, and he was further advised by North that such a shipment had taken place.

Defendant requests that these counts be dismissed for failure to state offenses under section 1001; that the statute may not be applied to unsworn statements by an Executive Branch official; that the statute does not provide fair notice to him that his conduct was prohibited by law; and that the false statements he allegedly made were not material.

### A. Statements made to Congress

Defendant contends most broadly that section 1001—the general federal false statements law—does not apply to statements made with respect to the non-admin-

istrative functions of the Legislative Branch. While conceding that no case has ever carved out such an exception, he urges that, inasmuch as the courts have held that the statute does not apply to the adjudicative functions of the Judicial Branch, this Court should, on the same basis, hold that the law does not apply to the Congress (except for its administrative functions).

It is quite correct that several courts have decided that a person may not be convicted under section 1001 for statements made in the course of judicial proceedings. See *United States v. Rodgers*, 466 U.S. 475, 483 n. 4, 104 S.Ct. 1942, 1948 n. 4, 80 L.Ed.2d 492 (1984), for a collection of the relevant cases; and in this jurisdiction see, *Morgan v. United States*, 309 F.2d 234, 237 (D.C.Cir.1962). Even if this Court were inclined to draw the parallel defendant invites it to draw between the Judicial and the Legislative Branches in this respect—and it is not [14]—the Court of Appeals for this Circuit has determined that section 1001 applies to congressional committee inquiries.

In *United States v. Hansen*, 772 F.2d 940, 943–44 (D.C.Cir.1985), that court, speaking through Judge (now Justice) Scalia explicitly and unambiguously held that a House committee is a "department" for purposes of section 1001, since that term "was meant to describe the executive, legislative and judicial branches of the Government" (citing *Bramblett infra*).[15] It further expressly held that the term "jurisdiction" encompasses an investigation by a congressional committee. *Id.* In other words, *Hansen* has authoritatively decided that a congressional investigation is "a ... matter within the jurisdiction of any department of the United States." That, of course, ends the matter as far as this Court is concerned.

### B. Unsworn and Informal Communications to Congress

 Defendant contends next that section 1001 may not properly be applied to an unsworn statement communicated by an Executive Branch official to a member or a committee of Congress in informal circumstances.

As discussed in Part II above, Poindexter, who was not under subpoena to meet with the members of the intelligence committees, nevertheless agreed to meet with some of these members and their staffs at the White House. According to his motion, the purpose of the meeting was to provide policy background prior to the taking of the sworn testimony of CIA Director Casey; Poindexter himself was not to appear for the actual hearings; the White House conference did not include the trappings of a formal committee meeting; he was not placed under oath; and no verbatim transcript was maintained. In short, the meeting partook of none of the formalities of a full-fledged congressional hearing.

Defendant predicts that the application of the false statements statute in that kind of setting would have a chilling effect on communications between the two branches of government. As he notes, "[o]fficials in

14. To do so would, *inter alia*, result in an interpretation of the law that punished the deception of Congress in trivial "administrative" contexts, while permitting deceptions that affect the core functions of the Legislative Branch. Moreover, the court in *Morgan* rested its decision on the problems that would arise in the judicial context were the statute applied to "traditional trial tactics," 309 F.2d at 237—a consideration that does not apply to statements made to the Congress.

15. Defendant's effort to characterize the *Hansen* case as one which, unlike the instant case, involves only housekeeping functions, is unavailing, for three reasons. First, the *Hansen* court did not suggest any distinction between congressional housekeeping and legislative functions, so as to include the former and exempt the latter. Second, it hardly makes sense to classify a congressional investigation of Hansen, a Member of Congress, as "housekeeping," while regarding an inquiry into the behavior of Executive officials, such as defendant, as legislative. Third, inquiries that begin as housekeeping matters frequently have the potential to result in legislative investigations—which is precisely what happened in *Hansen*—thus rendering impractical the distinction defendant seeks to draw. In addition to *Hansen*, see also, *United States v. Bramblett*, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955); *United States v. D'Amato*, 507 F.2d 26 (2d Cir.1974); *United States v. Diggs*, 613 F.2d 988 (D.C.Cir.1979); *North*, 708 F.Supp. at 383–84.

the Executive Branch routinely communicate with Congress concerning an enormous range of subjects relating to the business of government, including proposed legislation, matters under investigation by Congress, actions taken or contemplated by the Executive Branch, Congress's oversight of the Executive Branch, budget requests, treaties, and presidential appointments. Such communications may be written or oral, formal or informal, and may involve individuals at any level of the Executive Branch and either members of Congress or other staffs." Defendant's Memorandum at 19. In this view, the situation is aggravated by the fact that section 1001 prohibits false statements in the broadest sense.[16]

The Court is not unsympathetic to these considerations. It may indeed be that the application of section 1001 to statements made by Executive officials in the course of informal contacts with congressional officers would complicate future relationships between the two branches and thus could disrupt the orderly functioning of government. At a minimum, it could eventuate that the Executive officials would be more stilted and careful and less forthcoming than they might otherwise be.

■ On the other hand, it cannot be gainsaid that the chill defendant forecasts between the Executive and the Legislative Branches on account of false statement prosecutions may be nothing more than the natural consequence of the deterrent effect of the criminal law. After all, section 1001 does not punish expressions of differences of opinion between representatives of the two branches on policy issues, but only statements that are proven to be false. Moreover, as the government notes, at this juncture it is only speculation that enforcement of section 1001, as in the instant case, would damage communications between Congress and the Executive. Should such damage occur, the appropriate forum for a policy-driven exception to the statute would be the political branches, not the Judiciary.

■ In any event, here again, the Court is not writing on a clean slate. In *Marzani v. United States*, 168 F.2d 133 (D.C.Cir.), *aff'd by an equally divided Court*, 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431 (1948), the Court of Appeals upheld a conviction of a government employee who had lied about his past Communist connections. The court took note of the defendant's objection

... that the statements were not under oath and were not stenographically transcribed; that the interview was at appellant's request; that there were only two participants in the conference; that they addressed each other by their first names, and that they discussed a variety of topics.

*Id.* at 141–42. But, said the court, the statute

... does not limit the offense to formal statements, to written statements, or to statements under oath. It applies to 'any false or fraudulent statements or representations, ... in any matter with the jurisdiction of any department or agency of the United States.'

*Id.* at 142. This Court is of course bound by that determination and will follow it.[17]

---

**16.** Section 1001 has been held to prohibit not only false statements concerning objective facts but also false statements concerning intent. See *Corcoran v. United States*, 229 F.2d 295 (5th Cir.1956). It has been held to prohibit not only statements that are false but also those that fail to disclose a material fact. See *United States v. Mattox*, 689 F.2d 531, 533 (5th Cir.1982). It has also been held to reach statements not only made directly to the federal government but also statements submitted to nonfederal agencies receiving federal funds. See *United States v. Petullo*, 709 F.2d 1178, 1180 (7th Cir.1983). And it has been held applicable even to false statements in records subject to government inspection. See *Gonzales v. United States*, 286 F.2d 118 (10th Cir.1960).

**17.** Nor would the Court be justified in drawing the distinction defendant asks it to draw between ordinary citizens and officials of the Executive Branch. In our free, constitutional system, such a distinction would be proper only if it were clearly required by a mandate of the policymaking branches of government. No such mandate is present here.

On a similar basis, the Court rejects defendant's argument that the application of section 1001 to communications from the President's advisor on foreign affairs and national security would be improperly to invade the Presidential

## C. Materiality

 Defendant also argues that the allegedly false statements he made were not material to the committees' inquiries. Materiality is an essential element of the offense in a prosecution such as this. *Freidus v. United States*, 223 F.2d 598, 601 (D.C.Cir.1955); *Weinstock v. United States*, 231 F.2d 699, 701 (D.C.Cir.1956). The test of materiality is "whether the false statement has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a determination required to be made." *Weinstock* at 701–02; see also, *Hansen, supra*.

Defendant contends that the element of materiality is lacking here because the indictment does not allege that element and the government cannot prove actual reliance by the committees on his allegedly false statements. Neither claim is justified.

 The indictment alleges both in Count Four and in Count Five that defendant "unlawfully, willfully, and knowingly made and caused to be made *material* false, fictitious, and fraudulent statements and representations ..." (emphasis added). Insofar as proof is concerned, defendant's formulation represents a mistaken view of the law. The Court of Appeals has plainly said that "proof of actual reliance is not required; the Government need only make a reasonable showing of its potential effects." *Hansen*, 772 F.2d at 949; see also, *United States v. Diggs*, 613 F.2d 988, 999 (D.C.Cir.1979). This formulation of the appropriate standard by the Court of Appeals does not include the element defendant claims to be critical: that of actual reliance. See also, *United States v. Quirk*, 167 F.Supp. 462, 464 (E.D.Pa.), *aff'd*, 266 F.2d 26 (3d Cir.1959). In any event, it will be for those who evaluate the trial evidence to decide whether the government has proved materiality.

Defendant claims, more directly, that representations regarding his personal knowledge of the Hawk shipment to Iran were not material; that the committees were inquiring far more broadly into the participation of the United States government as such in sales of weapons to that country. That, again, is too cramped a view of the scope of congressional inquiries and of the concept of materiality. To be sure, the committees were investigating the issue of United States government involvement in sales of arms to Iran. But it was plainly material to that inquiry when the defendant—the President's principal advisor on national security and the senior official of the NSC, the body identified with the Iran initiative—first learned of government involvement in the shipment of arms to that country.

The motion to dismiss Counts Four and Five of the indictment is denied.

## IV

### Fair Notice Under Statute

Defendant contends, in a separate motion, that sections 1001 and 1505 of Title 18 failed to provide him with fair notice that his conduct was criminal, and that this vice infects Counts Two through Five. He does not, he cannot, argue that these statutes are impermissibly vague as not providing notice to one and all that it is a crime knowingly to make false statements to congressional bodies, as to other government agencies, or that it is a crime to deliberately obstruct investigations or inquiries by such entities. Both sections have been applied and sustained too many times for that argument to be seriously made.

 Defendant's point is both narrower and broader: it is that members of the Executive Branch so commonly make false statements when required to provide information to Congress, particularly with respect to sensitive activities, without ever having been prosecuted for their acts, that

prerogatives in these two areas. The President's unquestioned role in these constitutionally assigned functions may allow his advisor to be "less than forthcoming about prospective foreign policy initiatives," Defendant's Memorandum at 23; it does not allow such an advisor to make false statements to the Congress.

he was justified in believing that such action was not criminal. Defendant's Memorandum at 2–3, 8, 12–14. The Court rejects this notion for several reasons.

▮▮▮▮▮ First, it is simply not true that no Executive official had ever been prosecuted prior to the Iran-contra affair on the charge of lying to a congressional committee. See *United States v. Lavelle,* 751 F.2d 1266 (D.C.Cir.1985). Second, due process does not require that the government cite a "litigated fact pattern directly on point" as a prerequisite to the institution of criminal proceedings. *United States v. Mallas,* 762 F.2d 361, 364 (4th Cir.1985). It would therefore be irrelevant if Executive officials had not previously been prosecuted for false statements to Congress.[18] Third, Congress made it clear by enactment of the Hughes–Ryan Amendment, 50 U.S.C. § 413, which imposes substantial reporting requirements on the Executive Branch relating to intelligence activities, that it expects Executive officials to tell the truth when reporting to Congress with respect to such activities. Thus, if, as defendant claims, there is a pattern of lying by Executive officials when reporting to the Congress,[19] the proper response under Hughes–Ryan would be to end that practice rather than to sanction it by accepting it as a defense to a criminal charge. Finally, as Judge Gesell stated in *North,* it would come as no surprise to an ordinary citizen that section 1001 prohibits the making of false statements to a government agency; nor should it come as a surprise to a high government official. 708 F.Supp. at 368.

Defendant's motion to dismiss Counts II through V for lack of fair notice is denied.

---

## V

### Subpoenas Duces Tecum

Defendant has moved under F.R.Crim.P. Rule 17(c) for an order setting a pretrial return date at least sixty days before trial for subpoenas *duces tecum.* The government opposes the motion as premature and nonspecific. Defendant has also requested the production of documents from former President Reagan and former Vice President Bush.[20]

### A. General

Defendant argues that the pretrial production of documents by way of subpoena is necessitated by the large volume of papers known to exist relating to a variety of critical issues—evidentiary materials in the possession of government officials, including members of Congress and Presidents Reagan and Bush; highly sensitive intelligence reports relevant, *inter alia,* to a demonstration of knowledge and approval of defendant's activities and those of his alleged co-conspirators; documents relevant and necessary to prepare for the cross-examination of government witnesses; and documents relating to the issue of defendant's intent. Defendant's Motion at 2–3. This list is disquieting, for it parallels in substantial part the discovery motion defendant has filed and which the Court ruled on in detail under date of September 11, 1989.[21]

On that basis, the Court cannot but concur with the government's observation that pretrial return dates ought not be used improperly as blank checks for the use of

---

18. Prior litigation is a prerequisite only if the particular law is ambiguous or fails to give "to the world in language that the common world will understand [notice] of what the law intends to do if a certain line is passed." *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931).

19. The Court of course has neither the ability nor the jurisdiction to make a judgment on that issue.

20. In order to minimize confusion, the Court will generally refer herein to President George

Bush as Vice President Bush—the position he occupied at the time of the events which are the subject of this criminal action—and to former President Ronald Reagan as President Reagan.

21. This disquiet is not significantly alleviated by defendant's observation that, to the extent that the government complies with its obligation to produce documents in the possession of Executive Branch agencies, some, but not all, of this evidence will not be sought by subpoena. Defendant's Motion at 3 note 2.

trial subpoenas *duces tecum* as a supplemental discovery device. See *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Ferguson*, 37 F.R.D. 6 (D.D.C. 1965). The government also suggests that, under established law, the Court should delay dates and make rulings only on specific subpoenas to specific witnesses calling for the production of specific, identified materials.

The Court appreciates that, with respect at least to some documents, the litigation of such issues as privilege may take some time, and that an early return date is for that reason warranted. On the other hand, the Court is not prepared to hand to defendant a blank check for the issuance of wide-ranging subpoenas to government officials and others, either to duplicate discovery already allowed or to secure discovery that the Court rejected. In order to accommodate the various legitimate interests, the Court will order a return date forty days in advance of the trial, that is, December 13, 1989, with respect to specific subpoenas for clearly identified, relevant evidence, after application therefor is made.

## B. Presidential and Vice Presidential Documents

On September 11, 1989, in ruling upon defendant's discovery requests, the Court stated with respect to a demand for notes and diaries maintained by and for President Reagan and Vice President Bush, that it would defer a decision thereon, pending the filing of (1) legal memoranda from both parties on the question whether the Independent Counsel could be required to produce documents maintained by President Reagan, in view of the Presidential Records and Materials Preservation Act, 44 U.S.C.A. § 2101 et seq.; and (2) a more specific proffer from defendant as to the involvement of these two high officials in the events which led to his indictment. These papers have now been submitted.

First. The issue of the method of securing access to the Reagan documents has been resolved. The Independent Counsel submitted a memorandum which concluded that the Presidential Records Act grants to former President Reagan and to the Archivist of the United States, but not to counsel for the government, access to and control over these papers. Defendant responded by stating that, while he did not necessarily agree with the Independent Counsel's legal conclusions, he was willing to forgo production through that official by means of Rule 16, F.R.Crim.P., but would instead seek to access the Presidential and Vice Presidential documents by means of a subpoena *duces tecum* pursuant to Criminal Rule 17. Not only does this agreement settle the issue of the method of production; it is also preferable from the point of view of clarity. If any claims of privilege are advanced, they may be made directly, in response to the subpoena, rather than through the circuitous route of an objection made to the Independent Counsel who would then, in turn, pass such claims on to defendant and the Court.

Second. Defendant's more specific proffer concerning the materiality of the Presidential and Vice Presidential documents was submitted *in camera* (to avoid the disclosure of possibly privileged documents) and *ex parte* (to avoid revelation of defense strategy to the prosecution in advance of trial). The memorandum embodying that proffer, with various exhibits, was carefully examined by the Court.

According to that proffer, President Reagan met with Poindexter daily, frequently alone;[22] they routinely had conversations with regard to national security matters, including, among other things, the Iran initiative and the Contra support program; assistance to the Contras by third countries; the role of Richard Secord as a middleman in the transfer of arms to Iran; private and third country fundraising for the Contras; the depth of the Administration's commitment to the Contras and its desire to continue to provide military sup-

---

**22.** This is in sharp contrast to the relationship between President Reagan and Oliver North,

who may have never seen the President on a one-to-one basis.

port to them; the Administration's view of the relationship between the Boland Amendment and the National Security Council, and the application of that statute to the NSC; the Administration's view of the resolution of inquiry under consideration by the House Foreign Affairs Committee and on the accuracy of the chronology prepared by Oliver North and reviewed by Poindexter.

■■■ On a number of these issues, it is claimed, President Reagan formulated the Administration's position for the guidance of Poindexter (and sometimes others). On other issues, Mr. Reagan allegedly entertained Poindexter's plans without voicing any objection. It appears that notes were taken by the President and others on these conversations and, according to defendant, these notes or Presidential diary entries made pursuant thereto would support his defense to the charges in the various counts of the indictment.

If the claims made in defendant's proffer are correct—a matter which the Court of course cannot and does not evaluate at this stage of the proceedings [23] but, in view of the specificity of defendant's proffer,[24] accepts as true for present purposes—there is "a sufficient likelihood" that the documents sought from President Reagan would be material to the Poindexter defense.[25] Accordingly, if the defendant submits to the Court subpoenas *duces tecum* for specific, relevant documents in the cus-

tody of former President Reagan or of the Archivist of the United States on his behalf, with a return date sixty days in advance of trial, that is, November 23, 1989, the Court will authorize their issuance.

■■■ Third. The situation is different as concerns Vice President Bush. Although defendant asserts that the then Vice President knew about various activities relevant to this case, he does not and could not point to a Vice Presidential authorization of his activities as a defense—assuming for present purposes that authorization by a superior would be a valid defense—for the Vice President had no operational authority with respect to Poindexter. Regarding other subjects, *e.g.*, the claimed knowledge by high officials of defendant's activities, it appears to the Court, at least on the present showing, that the Vice Presidential papers may be largely cumulative. Therefore, based on that showing, and because of the deference due the incumbent President,[26] the Court denies defendant's request for the Bush papers at this time.[27]

Fourth. The Independent Counsel apparently has in his possession copies of an notes based upon some Presidential documents, Memorandum, at 16 and n. 7, and defendant requests the production of these papers. There is, however, a question of privilege at least as to some of the notes prepared by Independent Counsel attorneys. In any event, inasmuch as the Court

**23.** Only the papers themselves can provide the answer.

**24.** To preserve the *in camera* character of the proffer, its details are discussed herein only to the extent necessary for an explanation of the rationale underlying the Court's ruling.

**25.** *United States v. Nixon*, 418 U.S. 683, 700, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1973). The Court concludes that the defendant has made the showing required by Rule 17(c): (1) that the documents appear to be evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that he cannot properly prepare for trial without such production and inspection in advance of trial and that failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition." *Id.*

**26.** No individual, whatever his position, is exempt from the obligation inherent in our laws to provide evidence, especially where such evidence is sought by a defendant in a criminal case in the exercise of his constitutional right to mount a defense to serious charges against him. However, respect for the Chief Executive and head of a branch of government co-equal to the Judiciary dictates that the production of evidence from a sitting President not be coerced, by subpoena or otherwise, unless such evidence is necessary to the defense and a just resolution of the cause.

**27.** The Court's decision on this issue is obviously without prejudice to its reevaluation in the event that the defendant is able at a later point to make the case for a more pressing need for the documents in his defense against the charges.

has stated that it may authorize a subpoena for the originals, it will defer a ruling on defendant's separate request for copies and notes at this time, without prejudice to a renewal of the request if the demand for the original documents is frustrated or unduly delayed.

## VI

### *Constitutionality of CIPA*

■ Defendant contends that, as applied to him, section 5 of the Classified Information Procedures Act (CIPA), 18 U.S.C.App. IV § 5(a) is unconstitutional. Section 5 of CIPA requires a defendant to notify the prosecution prior to trial of all classified information the defense expects to use at trial. According to defendant, this requirement violates his Fifth Amendment right to remain silent; his Fifth and Sixth Amendment rights to testify in his own defense; his Sixth Amendment right to the effective assistance of counsel; his right to cross examine witnesses against him; and his right to due process of law. In the opinion of this Court, these contentions exaggerate the effects of the CIPA requirements, and they will be rejected.[28]

### A. General

Congress enacted CIPA as a means for coping with the so-called "graymail" problem—the problem of defendants in criminal cases threatening to introduce classified information at trial, thus confronting the government with the choice between permitting highly sensitive national security information to become publicly known, on the one hand, and capitulating to the graymail by dismissing the charges, on the other. H.R.Rep. No. 96–831, Pt. 1, 96th Cong., 2d Sess. (1980); S.Rep. No. 96–823, 96th Cong., 2d Sess. (1980) U.S.Code Cong. & Admin.News p. 4294. As may be imagined, both alternatives are unpalatable to the prosecuting authorities and presumably to the public. CIPA seeks to resolve this difficulty by giving the trial judge the opportunity to rule on questions of admissibility of classified information in advance of its use as evidence in open court.

Under the CIPA procedures, as defendant correctly states, the defense is required (by section 5) to notify the Court and the prosecutor of its intention to disclose particular classified information at trial. Section 6(a) permits the prosecution thereafter to request an *in camera* hearing for a determination of the use, relevance, and admissibility of this proposed defense evidence. If the Court makes an affirmative finding with respect thereto, the government may move for, and the Court may authorize, the substitution of unclassified facts or a summary of the classified information in the form of an admission by the government. Under section 6(e)(2) if the government prevents a defendant from disclosing classified information at trial, the Court may find against the prosecution on any issue to which the excluded information relates; it may strike or preclude the testimony of particular government witnesses; and it may dismiss the indictment or specific counts thereof.

As this summary of the provisions of CIPA suggests, the law establishes a carefully balanced framework for consideration of the difficult issue of the use of classified information by the defense. In addition, although the statute in terms speaks only of a defense obligation to disclose the classified information it intends to use at trial, this Court has also required the government to present all the classified documents it intends to introduce as part of its case-in-chief,[29] and the government must, in fact, do so before the defense makes its disclosure.[30]

---

28. The government also argues that a decision on this issue would be premature because defendant is not yet being required to do anything pursuant to the statute. While that observation is technically accurate, nothing would be gained by the brief delay in adjudication that would follow from the Court's deferral in accordance with the government's argument.

29. That is also the procedure adopted in the *North* case.

30. The government claims that it has already complied with this obligation.

Moreover, the protection of the rights of defendant is paramount under the statutory scheme: if the Attorney General files an affidavit objecting to the disclosure of the classified material,[31] and the Court determines that other remedies, including satisfactory unclassified substitutes providing defendant "with substantially the same ability to make his defense as would disclosure of the specific classified information," cannot be fashioned,[32] it must provide relief, including, where appropriate, by a dismissal of the indictment.

This Court is fully mindful of its obligation, stemming from the Constitution itself, as well as from the statute, not to deprive the defendant of the ability to defend himself against the criminal charges brought against him. As between that obligation, on the one hand, and the various governmental interests involved, on the other,[33] the Court does not intend to relegate defendant's constitutional rights to second place.

In conformity with the statute, the Court expects to make a substantial effort, with the assistance of the parties, to fashion equivalent substitutes for highly sensitive documents where these documents cannot be revealed in their original form due to the potential damage to national security.[34] If for some reason a substitute cannot be fashioned for reasons other than a defense failure to cooperate in good faith, and the document or documents in question are clearly material, the Court will not hesitate to grant the appropriate relief to the defendant, if necessary by a dismissal of the charges.[35]

In connection with defendant's assertion that the burdens imposed on him by CIPA are onerous while "no burden whatsoever" is imposed on the government, Reply Memorandum at 5, not only is that claim disproved by the discussion *supra*, but it must also be remembered that, in addition to its CIPA burdens, the government has discovery obligations not incurred by a criminal defendant. These include the duty to furnish to a criminal defendant in advance of trial: (1) documents that are material to the preparation of the defense, (2) documents the government intends to introduce in its case-in-chief; (3) documents that were obtained from or belong to the defendant; (4) all written or recorded statements of the defendant; (5) a copy of defendant's prior criminal record; (6) reports of physical or mental examinations and scientific tests or experiments; (7) all exculpatory evidence; and (8) all prior statements of government witnesses. In short, defendant's complaint that he is laboring under burdens not shouldered by the government is simply untrue.

It is not surprising, therefore, that every court that has passed on the constitutionality of CIPA has upheld it. See *United States v. Wilson*, 750 F.2d 7, 9–10 (2d Cir. 1984); *United States v. Wilson*, 721 F.2d 967, 976 (4th Cir.1983); *United States v. Collins*, 720 F.2d 1195, 1200 (11th Cir. 1983); *United States v. Jolliff*, 548 F.Supp. 229, 231 (D.Md.1981); *U.S. v. North*, 708 F.Supp. 399 (D.D.C.1988).

To be sure, defendant correctly states that, because of his previous position as National Security Advisor and because of the nature of the charges, these proceedings may be extraordinary in the breadth of the classified information involved.[36]

**31.** Section 6(e) of CIPA.

**32.** Section 6(c)(1) of CIPA.

**33.** These interests include the continued prosecution of the defendant as well as the need to safeguard classified materials.

**34.** The Court assumes that, as in *North*, the government will not prevent the defendant from use as evidence in his defense documents which, whatever their technical classification, would not harm national security if disclosed, and further, that documents actually used in the

*North* trial will be disclosed here as well, without objection.

**35.** However, both parties are on notice that the Court will neither honor the designation by the defendant of documents that are plainly not material and where the principal aim is to generate a dismissal, nor will it countenance government refusals to cooperate with the publication of documents which would not be harmful to national security.

**36.** However, as the Court noted in its September 11, 1989 Opinion, much of that information is

However, the Court is not prepared to hold that, for this reason alone, the congressionally-mandated CIPA process will not be applied. If defendant's suggestion constituted the proper rule, public officials in high national security positions would in practical effect be immune from the operation of the criminal laws with respect to criminal excesses in the exercise of their authority: in the absence of the CIPA tool provided by Congress for dealing with the classified information dilemma, prosecutions instituted on account of such derelictions by such officials would inevitably have to be aborted. That is not, that cannot be, the law. No court has so held, and this Court will not set such a precedent.

The Court will now turn to defendant's specific constitutional arguments.

### B. Fifth Amendment

██ Defendant's principal contention is that, inasmuch as CIPA requires him to divulge to the government what classified information he may personally testify to at trial, the statute impermissibly burdens his Fifth Amendment right to be silent and his right to testify in his own defense. This contention is erroneous on several grounds.

In the first place, section 5 of CIPA does not require a defendant to specify whether he will testify or what he will testify about. The statute requires merely a general disclosure as to what classified information the defense expects to use at the trial, regardless of the witness or the document through which that information is to be revealed. In other words, defendant need *not* reveal what he will testify about or whether he will testify at all.

Moreover, it is of course hardly a novel proposition that defendants in criminal cases may be required to disclose elements of their defenses in advance of trial. Examples of such requirements are Fed.R. Crim.P. 12.1 (alibi defense); Fed.R.Crim.P. 12.2 (insanity defense); Fed.R.Crim.P. 12.3 (public authority defense); Fed.R.Crim.P. 16 (medical and scientific tests, and tangible objects, and certain documents). Provisions requiring the revelation of such defenses in advance of trial have consistently been held to be constitutional. *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970);[37] *Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); and see, *e.g., United States v. Fitts,* 576 F.2d 837 (10th Cir.1978); *United States v. Buchbinder,* 796 F.2d 910 (7th Cir.1986); *United States v. Duggan,* 743 F.2d 59 (2d Cir.1984).[38]

Defendant relies for the contrary proposition primarily upon *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972). However, the state statute there at issue, unlike the federal immunity law, required the defendant to testify at the outset of the presentation of his case or to forego testifying altogether. It was that feature of the statute, and none other, that caused the Supreme Court to find a constitutional violation. But here, as noted above, there is no compulsion on the defendant to reveal as to when he will testify, or even whether he will testify. All he is required to do under CIPA is to identify the classified information on which his side intends to rely in the course of its overall presentation, not who will disclose it as a part of any particular testimony. In short, it is simply not true that, as defendant asserts, he, "like the defendant in *Brooks,*

relevant and material only indirectly, as part of the defendant's purpose to demonstrate lack of motive and hence lack of criminal intent.

**37.** Defendant attempts to distinguish *Williams* principally on the ground that the Florida statute there before the Court excluded the defendant's own testimony from the notice requirement. However, there is no indication that the Supreme Court's decision depended on that fact. Other than simply to quote the language of the statute, the Court did not even refer to the provision defendant here regards as critical. And none of the decisions interpreting and pass-

ing on the federal notice provisions make the distinction defendant proposes.

**38.** Defendants have also been required to reveal their defenses in additional circumstances, such as the relation of particular testimony to evidence the defendant intends to present. See, *e.g., United States v. Mitchell,* 385 F.Supp. 1190, 1192–93 (D.D.C.1974); *United States v. Ismaili,* 828 F.2d 153, 161–62 (3rd Cir.1987); *United States v. Trenary,* 473 F.2d 680, 682 (9th Cir. 1973).

is compelled to choose ... whether he will testify at trial." Defendant's Memorandum at 6.[39] The leap from the requirement of disclosure—similar to the disclosure of an alibi or an insanity defense—to a violation of defendant's right to testify or not to testify, is too wide to be justified.

Defendant further seeks to distinguish the precedents by pointing to the important interests present in the decided cases on the government's side of the equation. *E.g.*, Defendant's Memorandum at 9 (importance of rules designed to assure fairness and reliability). However, as the Supreme Court has noted, "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307, 101 S.Ct. 2766, 2782, 69 L.Ed.2d 640 (1981). CIPA serves that interest by providing a mechanism for protecting both the unnecessary disclosure of sensitive national security information and by helping to ensure that those with significant access to such information will not escape the sanctions of the law applicable to others by use of the graymail route. S.Rep. No. 96–823, 96th Cong., 2d Sess. at 3 (1980) U.S.Code Cong. & Admin.News pp. 4294, 4296.

## C. Counsel, Confrontation, and Due Process

Similar, if not identical, considerations dispose of defendant's arguments which assert a denial of effective assistance of counsel, the failure to afford confrontation, and a denial of due process.

Defendant's claim that his Sixth Amendment right to counsel is violated when he is required to testify before his counsel has the opportunity to make an educated decision on whether to have defendant take the stand is merely the Fifth Amendment argument discussed above in another garb. See also, *Lakeside v. Oregon*, 435 U.S. 333, 341, 98 S.Ct. 1091, 1096, 55 L.Ed.2d 319 (1978).

■ Likewise without substance is the complicated argument that CIPA violates defendant's "Sixth Amendment right to confront the witnesses against him by forcing him to notify the prosecution pretrial of all the classified information that he expects to elicit from prosecution witnesses on cross-examination and all such information that will be disclosed in defense counsel's questions to those witnesses." Defendant's Memorandum at 13, 15. This argument assumes that defendant has an unqualified right to undiminished surprise with respect to his cross-examination, and that if there is any impairment of the element of surprise, however slight, cross-examination must be regarded as *per se* ineffective.[40]

However, as the Supreme Court said in *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986), "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish" (emphasis in original). See also, *United States v.*

**39.** To buttress the point that he could not be required to provide notice of the classified information he intends to use at trial, defendant notes that in the *North* case, Judge Gesell did not require the defendant to notice his anticipated classified testimony. Memorandum at 11 n. 8. That is correct only in a technical sense. Judge Gesell ruled that

There will be no review of defendant North's testimony in advance. When and if he is about to testify, his counsel will advise the Court if it then appears the testimony will involve classified national security disclosures beyond those then authorized under prior rulings of the Court and, again, a specific further ruling will be obtained.

698 F.Supp. at 322. Moreover, by that time, Judge Gesell had already required North to dis-

close pursuant to section 5 of CIPA (1) each classified document he intended to use at trial (orders of July 8, 1988, August 5, 1988, and October 19, 1988) and (2) all classified documents or other classified testimonial information not covered by previous CIPA orders that North reasonably expected to use at trial (orders of November 23, 1988 and December 22, 1988).

**40.** Of course, CIPA does not "eviscerate[ ] the right [to cross examination] altogether." Defendant's Memorandum at 14–15. The statute requires a defendant merely to identify the universe of the classified information he intends to use; he need not attribute any particular piece of information to the cross examination of any particular witness.

*Owens,* 484 U.S. 554, 108 S.Ct. 838, 842, 98 L.Ed.2d 951 (1988); *Kentucky v. Stincer,* 482 U.S. 730, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987); *United States v. Tarantino,* 846 F.2d 1384, 1405 (D.C.Cir.1988); *United States v. Anderson,* 881 F.2d 1128, 1137 (D.C.Cir.1989). Finally, as concerns the claim that the disclosure requirements of CIPA violate the Due Process Clause by imposing a "one-sided burden" on him, it also lacks merit. As discussed at some length above, the CIPA burdens are not one-sided, but they are carefully balanced,[41] and there is therefore no basis for a due process complaint. *United States v. Collins,* 720 F.2d 1195 (11th Cir.1983).

## VII

### *Surplusage*

■ Defendant has moved pursuant to Fed.R.Crim.P. 7(d) to strike surplusage from the indictment.[42] It is clear (1) that with respect to surplusage the Court has wide discretion,[43] and (2) that the standard under Rule 7(d) is exacting.[44] It is also settled that a defendant is entitled to have language stricken only if it is both irrelevant and prejudicial, see, *e.g., United States v. Jordan,* 626 F.2d 928, 930 n. 1 (D.C.Cir.1980), and the Rule has been construed as not favoring the striking of surplusage. *Id.*

■ First. Defendant requests that the Court strike from the indictment the terms "among other things," "among others," "among," "at least," "including," "included, but not limited to," "in part," and "various," the contention being that this language will lead the jury to speculate that defendant was guilty of or responsible for actions in addition to those charged in the indictment. The government points to the fact that Judge Gesell declined to strike this type of language in *North,* and that in several contexts its use is innocuous.

The Court does not agree. It indicated in *United States v. Whitehorn,* 710 F.Supp. 803, 819 (D.D.C.1989) that similar terms could improperly indicate to a jury that the defendants were charged with offenses and conduct in addition to those actually listed in the indictment, and on this basis it ordered them stricken. Similar reasoning and a similar result apply here. Accordingly, the Court hereby orders all such language stricken.[45]

Second. Defendant claims that certain language in the indictment is needlessly inflammatory. However, with respect to most of the terms to which defendant objects, the language is necessary, neutrally descriptive, or both.

■ For example, defendant objects to use of the term "lethal" in relation to supplies being shipped to the Contras. However, through much of the history of the relations between the United States and the Contras, a distinction has been made between lethal and humanitarian assistance, and there is no reason why those

---

**41.** If, as in *Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), there were no balance, the relevant statute could not stand.

**42.** Defendant's related motion, that for a bill of particulars, is not well taken. As discussed in Parts I through IV, *supra,* the indictment adequately apprises defendant of the charges against him. The particulars defendant requests go essentially only to the evidentiary details and the government's legal theory, and they therefore need not be spread upon the record by a bill of particulars. *See United States v. Pollack,* 534 F.2d 964, 970 (D.C.Cir.1976). The request is especially ill founded in view of the government's uncontradicted claim that it has furnished to defendant hundreds of thousands of pages of materials, including copies of all the documents it intends to offer in its case-in-chief.

(The government has also provided further particulars as part of its Memorandum filed September 8, 1989). In short, defendant has ample notice of the facts needed to prepare his defense. See also, the November 8, 1988 Order in *North.*

**43.** The Rule provides that the court "may" strike surplusage.

**44.** See C. Wright, *Federal Practice and Procedure: Criminal* 2d § 127 at 426 (1982).

**45.** Of course, as in *Whitehorn,* the government will not be precluded by this ruling from introducing relevant and material evidence tending to prove the conspiracy charged in Count One, and the manner and means by which it was to be achieved. See 710 F.Supp. at 819.

properly descriptive terms should be excluded from the indictment.[46]

■ Similar reasoning causes the Court to deny defendant's objection to the terms "Enterprise," "divert," "diversion," and "clandestine." Indeed, the term "Enterprise," which defendant has particularly emphasized, is a fairly neutral description of the activities of the alleged conspirators.[47] Defendant contends to the contrary that the jury might relate the term to racketeering, on the basis that "the word 'enterprise' is a well-known term of art under the RICO statute." Defendant's Memorandum at 10. There may be a few dozen lawyers in this country to whom this "term of art" is well known and who will immediately think of RICO when the word "enterprise" is mentioned; to most individuals, if that term means anything other than a business, it more likely evokes a starship or a space shuttle.

■ However, the Court agrees with defendant that use of the term "cover up" is inflammatory, especially in the context of the kind of criminal activity that is at issue here. Further, inasmuch as the term is used in the indictment in tandem with the word "conceal," it is not necessary, and it is therefore hereby ordered to be stricken.

■ Third. Insofar as defendant's category of "irrelevant descriptive recitals" are concerned, the Court will, once again, retain some terms and strike others. The references in Counts Two, Three, and Four to Poindexter's original co-defendants Secord and Hakim are relevant to the obstruction and false statement claims, and they will not be stricken. On the same basis, the Court will not require the elimination of references to press reports about shipments to Iran, as they are necessary to an understanding of the background of the congressional inquiries and the activities of the defendants with respect thereto. See *United States v. Langella,* 776 F.2d 1078, 1081 (2d Cir.1985).

■ On the other hand, there is no valid reason for allegations in the indictment that Oliver North was discharged and that Poindexter resigned from their respective positions. Inclusion of these facts could be taken by the jury as objective indications of fault or of Reagan Administration determinations of fault; they are thus prejudicial without having any special relevance. These particular allegations are therefore ordered to be stricken.

■ Fourth. Defendant contends that the references in the indictment to the Boland Amendment improperly suggest to the jury that he violated that statute, and that on this basis all such references should be stricken. The request is denied. It is defendant's theory that references to the Boland Amendment have relevance, if at all, only to his state of mind. Defendant's Memorandum at 15. That, however, is not a justified assumption. To be sure, "the defense contends" that this statute was inapplicable to the NSC staff and, according to defendant, the "evidence in this case will establish" that it was not intended to apply to that staff and could not constitutionally have been applied to that staff's activities. Defendant's Memorandum at 15 and n. 14. However, obviously the relevance of the Boland Amendment to this case is not to be measured by defendant's contentions alone.

The Boland Amendment restrictions were the focus of the congressional inquiries at issue here, as well as of defendant's allegedly false and misleading statements.[48] To eliminate from the indictment

---

**46.** Defendant's objection to the description of military supplies as consisting of "millions of rounds" and "hundreds of thousands of pounds," is likewise not well taken, since those were apparently the quantities involved, at least according to the government.

**47.** In fact, one of the defendants, Secord, apparently used the term in that context before the Iran-contra congressional committee.

**48.** Defendant's claim is that this case is "virtually identical" to *United States v. Mandel,* 415 F.Supp. 997, 1008–09 (D.Md.1975), in that there, as here, the defense contended that certain subjects were inapplicable to the defendant. However, the Code of Ethics in *Mandel* was merely one of many possible indicia of an intent to deceive, and the *Mandel* decision questioned whether the prosecution would even be able to demonstrate the Code's relevance at trial. Be-

references to the Boland Amendment would be the equivalent of performing "Hamlet" without the Prince of Denmark.[49]

Similar reasoning applies to defendant's request that the Court strike the background paragraphs in Count One—those that describe the relationship between the United States and Iran, the fact that hostages were held in Lebanon, the seizure of the American embassy in Iran, and the like. These paragraphs are not only not prejudicial but they are relevant in the sense that it would be difficult, if not impossible, for the jury to understand defendant's allegedly false statements and obstruction without that background. See *United States v. Langella, supra.*

As concerns, finally, the incorporation by reference in Counts Two through Five of the allegations in Count One regarding Secord and Hakim, Poindexter's co-defendants at the time the indictment was returned, here again, the activities of the Enterprise, of which these two defendants were allegedly members, were among the very subjects of the false statements and the obstruction with which Poindexter is charged. The request to strike them is therefore likewise denied.

## VIII

### *Publicity, Department of Justice Policies, and Abuse of Grand Jury*

The remaining motions require only relatively brief discussion.

### A. *Pretrial Publicity*

■ Defendant has moved to dismiss the indictment, or in the alternative, for a

change of venue, because of prejudicial pretrial publicity.

As concerns the defense request for a dismissal, there does not appear to be a single precedent anywhere in the federal court system granting so drastic a remedy, no matter how widespread or prejudicial the publicity.[50] No reason has been advanced for establishing such a precedent here.

■ Moreover, even a change of venue is not warranted, for several interrelated reasons.

In *United States v. Haldeman,* 559 F.2d 31, 60, 63–64 (D.C.Cir.1976), the Court of Appeals for this Circuit held that an appropriate voir dire of potential jurors was preferable to a transfer to another venue as a means for dealing with pretrial publicity.[51] At a time when this case was still joined with that of Oliver North, Judge Gesell denied a similar motion without prejudice, observing that "[e]xperience here again in this city with high profile cases engendering publicity such as Watergate ... strongly suggest that a completely impartial jury can be seated." *United States v. North,* 713 F.Supp. 1444 (D.D.C.1989). Following the voir dire, the Court reiterated that view, stating that it was "entirely satisfied that the jurors eventually selected are unbiased ...". *North,* 713 F.Supp. at 1445. The verdict in *North*—a conviction on some counts and an acquittal on most others— has validated that judgment.

In the event, both in Watergate and in the *North* case, it was found possible to assemble an impartial jury notwithstanding publicity that was far more widespread than in the instant case.

---

cause of the Boland Amendment's crucial position in the instant case, no such question exists here.

**49.** W. Scott, *The Talisman,* introduction.

**50.** *United States v. Sweig,* 316 F.Supp. 1148 (S.D. N.Y.1970), cited by defendant, merely suggested that dismissal might be warranted where prosecutorial misconduct contributed to prejudicial publicity that influenced a grand jury. Even that dicta however, was rejected by the Second Circuit. See *United States v. Curcio,* 712 F.2d 1532, 1544–45 (2d Cir.1983). Similarly, in *Dela-*

*ney v. United States,* 199 F.2d 107 (1st Cir.1952), the other case relied on by defendant, the court upheld a trial judge's decision to deny a motion to dismiss, questioning whether a dismissal on account of prejudicial pretrial publicity would ever be appropriate. 199 F.2d at 111–12.

**51.** In that case, relied on by defendant, Memorandum at 16, it was the court's decision that the "District Court was correct to follow this circuit's well established procedure by refusing appellants' pre-voir dire requests for a continuance or a change of venue." 559 F.2d at 63–64 (citations omitted).

Moreover, what publicity there has been has not been especially prejudicial to Poindexter. This is not a case, such as one involving a rape, the large-scale distribution of drugs, murder under revolting circumstances, or the like, that causes widespread and near-unanimous revulsion against the accused. See *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). To the contrary. Media coverage and public opinion have been divided, with some regarding the Iran-contra defendants as deserving of public opprobrium while others consider them to be national heroes.[52] See, *United States v. Moreno Morales*, 815 F.2d 725, 736 (1st Cir.1987).

Defendant argues that the publicity that followed the verdict in the *North* case was damaging to him, in that Judge Gesell and others made comments that could be construed as referring to Oliver North's superiors as being as guilty as or more guilty than North. However, to the extent that there was such comment, it appears to have been directed not at this defendant but at President Reagan and others better known to the public than Poindexter.[53] In any event, just as the Court of Appeals found in *Haldeman* that the Watergate defendants received a fair trial notwithstanding widespread publicity, so can this defendant.[54]

### B. Failure to Follow Department of Justice Policies

■ There is likewise no merit to the motion to dismiss the indictment for failure

to follow the policies of the Department of Justice. The very nature of the Independent Counsel's responsibilities suggests that it may not always be possible for him to follow those policies,[55] and it is for that very reason that the Independent Counsel statute explicitly provides that he is required to follow Department of Justice policies only "to the extent possible." See 28 U.S.C. § 594(f).[56] On this basis, defendant's contentions—that the Independent Counsel should have secured the permission of the Attorney General before prosecuting him as one who received a grant of immunity, or that he should have secured an Attorney General determination as to whether prosecution would lead to excessive disclosure of classified information[57]—border on the frivolous. The Independent Counsel, as the very name suggests, is to be independent of the Attorney General.

■ Moreover, much of defendant's argument rests on alleged departures from guidelines set forth in the U.S. Attorney's Manual—a document that, by its own language, creates no rights in any party. U.S. Attorney's Manual § 1–1.00 (1984); *United States v. Busher*, 817 F.2d 1409, 1411–12 (9th Cir.1987); see also *United States v. Caceres*, 440 U.S. 741, 749–55, 99 S.Ct. 1465, 1470–73, 59 L.Ed.2d 733 (1979).

### C. Prosecutorial Abuse of Grand Jury

There is no merit whatever to the claim that the Independent Counsel in several ways abused the grand jury process.

---

**52.** President Reagan himself expressed that view, widely reported in the press, with respect to Oliver North. *Washington Post*, March 26, 1989 at p. A1.

**53.** To be sure, as defendant points out, one of the *North* jurors did refer to Poindexter by name. *Washington Post*, May 6, 1989 at p. A7. But that comment, and what publicity it received, was isolated. Indeed it is found in the thirty-third paragraph of a thirty-four paragraph article.

**54.** It is not apparent, in any event, what a change of venue would accomplish. The publicity regarding the Iran-contra affair, like that accompanying many "governmental," white collar criminal cases, and unlike those involving

common law offenses, has been national rather than local.

**55.** See also, *North*, Order of November 10, 1988 at 18 n. 1.

**56.** See also, S.Rep. No. 123, 100th Cong., 1st Sess. 24, *reprinted in* 1987 U.S.Code Cong. & Adm.News 2150, 2173.

**57.** As for defendant's related claim that his prosecution by the Independent Counsel risks the revelation of national secrets, the short answer is that it would be the intelligence agencies, not defendant, that would have cause for complaint. See Attorney General's Guidelines for Prosecutions Involving Classified Information at 7.

■ First. Defendant asserts that the Independent Counsel failed to present exculpatory evidence to the grand jury, and that this so tainted the process that the indictment should be dismissed. In the first place, it is the majority view in the federal courts that the prosecution has no duty to present exculpatory evidence to the grand jury. See generally, *United States v. Ismaili*, 828 F.2d 153, 165 n. 13 (3d Cir.1987). Furthermore, the only specific evidence cited in support of defendant's claim is the alleged failure of the Independent Counsel to present to the body President Reagan's response to written interrogatories. However, not only is it not established that the President's views would have been exculpatory, but his answers to the written interrogatories were, in fact, presented to the grand jury. *North*, 713 F.Supp. at 1450. Finally on this issue, the Court notes the Supreme Court's admonition in *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956) that a defendant has no right to "a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury."

Second. Defendant asserts that the presence of Associate Independent Counsel before the grand jury was improper, in that section 594(c) of the Ethics in Government Act unconstitutionally empowers the Independent Counsel to appoint associates or other assistants. The Supreme Court held the Independent Counsel provisions of the Ethics in Government Act to be constitutional just last year in *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988)—a decision nowhere mentioned in defendant's papers. In another decision directly on point but not referred to by defendant—*In re Sealed Case*, 829 F.2d 50, 57–59 (D.C.Cir.1987)—the Court of Appeals for this Circuit specifically determined that

Associate Independent Counsel may conduct grand jury investigations.

Third. The final claim of alleged prosecutorial misconduct are that the Independent Counsel, a former federal judge, was at times referred to before the grand jury as "Judge Walsh," and that he improperly expressed his appreciation to the grand jury and otherwise sought to create the impression that the grand jury and those presenting evidence to it were engaged in a joint enterprise. With respect to the first claim, Judge Gesell advised counsel in open court as long ago as June of last year that complete disclosure had been made to the grand jury of Mr. Walsh's nonjudicial status. *North*, 708 F.Supp. at 372. As concerns the second, the Court concludes that the statements quoted by defendant are so innocuous as to render inappropriately extravagant his call for the use of this Court's supervisory power to curb a "pattern of extensive prosecutorial misconduct." Defendant's Memorandum at 19.[58]

## IX

### *Kastigar Issues*

The parties' submissions are not sufficiently developed on various key points to permit the Court to render a decision at this time on the issues arising under *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), regarding the relationship between this prosecution and the immunity granted to Poindexter with respect to his testimony in Congress.[59] Accordingly, the Court will hold a non-evidentiary hearing on *Kastigar* issues on October 27, 1989, at 10:00 a.m. Among the issues to be discussed at that hearing will be the question of the right of the defendant to a dismissal on account of taint from immunized testimony, or to an evidentiary

---

**58.** It should also be noted that, when this defendant's case was still before him, Judge Gesell reviewed the grand jury transcripts and found no evidence of abuse.

**59.** For example, while the government's memorandum relies on various legal principles, it does not always make it clear how these principles apply to the facts of this case. Thus, the

memorandum states (at p. 19) that the prosecution "may rely on the testimony of witnesses who have been exposed to immunized testimony," but it does not attempt to explicate the breadth of the exposure of the trial witnesses, the period when it occurred, or its impact on the witnesses' independent knowledge, if any.

hearing with respect thereto, for the following four separate categories of persons: (1) grand jurors, (2) grand jury witnesses, (3) Independent Counsel attorneys, and (4) prospective trial witnesses.

With respect to witnesses, the parties are invited to address the subject both with respect to those whose names and the substance of their testimony were memorialized in sealed submissions to the Chief Judge of this Court or otherwise, prior to the taking of immunized testimony in Congress; and with respect to those whose names and testimony were not known or fixed before that testimony was taken. With respect to Independent Counsel attorneys, the parties are invited to distinguish between attorneys who were subjected to the procedures Mr. Walsh testified to before Judge Gesell in April 1988, and those who became involved in the Independent Counsel's Iran-contra effort after that time. The parties may also wish to discuss what type of pretrial evidentiary hearing, if any, would be appropriate or required. One hour will be allocated to each side.

## X

### *Trial Date*

Upon consideration of the pretrial work that must still be done by the parties and the Court, as well as the tasks to be performed by the so-called Interagency Group with respect to the identification of classified materials in connection with the CIPA process, the Court is setting January 22, 1990 as the date for the start of the trial.